# UNITED STATES *v.* BROCE ET AL.

No. 87–1190.   Argued October 4, 1988—Decided January 23, 1989

*Roy T. Englert, Jr.*, argued the cause for the United States. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Rule, Deputy Solicitor General Cohen*, and *Deputy Assistant Attorney General Starling*.

*Glenn E. Casebeer II* argued the cause for respondents. With him on the brief was *Curt T. Schneider*.

JUSTICE KENNEDY delivered the opinion of the Court.

We consider here the circumstances under which a defendant who has entered a plea of guilty to a criminal charge may assert a double jeopardy claim in a collateral attack upon the sentence. Respondents, upon entering guilty pleas, were convicted of two separate counts of conspiracy, but contend now that only one conspiracy existed and that double jeopardy principles require the conviction and sentence on the second count to be set aside. The United States Court of Appeals for the Tenth Circuit held that respondents were entitled to introduce evidence outside the original record supporting their claim and directed further proceedings in the District Court. We hold that the double jeopardy challenge is foreclosed by the guilty pleas and the judgments of conviction.

## I

### A

Respondents, Ray C. Broce and Broce Construction Co., Inc., bid for work on highway projects in Kansas. Two of the contracts awarded to them became the subject of separate indictments charging concerted acts to rig bids and suppress competition in violation of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1. The relevant portions of the indictments are set forth in the Appendix to our opinion. The first indictment charged respondents with entering into an agreement, sometime in or about April 1978, to rig bids on a particular highway project. The second charged respondents with entering into a similar agreement, sometime in or about July 1979, to rig bids on a different project. Both indictments were discussed during plea negotiations, and respondents acknowledged in plea agreements that they were subject to separate sentences on each conspiracy charged. Plea Agreement between the United States of America and Defendant Ray C. Broce, App. to Pet. for Cert. 126a, 127a; Plea Agreement between the United States of America and

Defendant Broce Construction Co., Inc., App. to Pet. for Cert. 133a, 134a.

Respondents pleaded guilty to the two indictments in a single proceeding. The District Court conducted a hearing fully in accord with Rule 11 of the Federal Rules of Criminal Procedure and found that the pleas were free and voluntary, made with an understanding of their consequences and of the nature of the charges. Respondents had counsel at all stages and there are no allegations that counsel was ineffective. Convictions were entered on the pleas. The District Court then sentenced Broce to two years' imprisonment on each count, the terms to run concurrently, and to a fine of $50,000 on each count. Broce was also sentenced for mail fraud under 18 U. S. C. § 1341, a conviction which is not relevant here. The corporation was fined $750,000 on each count, for a total of $1,500,000. Neither respondent having appealed, the judgments became final.

## B

On the same day that respondents entered their pleas, an indictment was filed against Robert T. Beachner and Beachner Construction Co. charging a violation of both the Sherman Act and the mail fraud statute. The indictment alleged a bid-rigging conspiracy involving yet a third Kansas highway construction project. These defendants, however, chose a different path than that taken by the *Broce* respondents: they proceeded to trial and were acquitted. After the acquittal in the *Beachner* case *(Beachner I)*, a second indictment was returned by the grand jury charging Beachner Construction Co. with three new Sherman Act violations and three new acts of mail fraud. The Sherman Act counts charged bid-rigging conspiracies on three Kansas highway projects not mentioned in *Beachner I*.

Once again, Beachner pursued a different strategy than that followed by Broce and Broce Construction Co. Prior to trial, Beachner moved to dismiss the indictment on the ground that the bid-rigging arrangements identified were

merely smaller parts of one overarching conspiracy existing among Kansas highway contractors to rig highway bids within the State. In light of its acquittal in *Beachner I*, the company argued that a second prosecution would place it in double jeopardy.

The District Court granted the motion to dismiss. *United States* v. *Beachner Construction Co.*, 555 F. Supp. 1273 (Kan. 1983) *(Beachner II)*. It found that a "continuous, cooperative effort among Kansas highway contractors to rig bids, thereby eliminating price competition, has permeated the Kansas highway construction industry in excess of twenty-five years, including the period of April 25, 1978, to February 7, 1980, the time period encompassed by the Beachner I and Beachner II indictments." *Id.*, at 1277. The District Court based the finding on its determination that there had been a common objective among participants to eliminate price competition, a common method of organizing bidding for projects, and a common jargon throughout the industry, and that mutual and interdependent obligations were created among highway contractors. Concluding that the District Court's findings were not clearly erroneous, the Court of Appeals affirmed the dismissal. *United States* v. *Beachner Construction Co.*, 729 F. 2d 1278 (CA10 1984).

## C

One might surmise that the *Broce* defendants watched the *Beachner* proceedings with awe, if not envy. What is certain is that the *Broce* defendants sought to profit from Beachner's success. After the District Court issued its decision to dismiss in *Beachner II*, the *Broce* respondents filed a motion pursuant to Federal Rule of Criminal Procedure 35(a) to vacate their own sentences on the Sherman Act charge contained in the second indictment. Relying on *Beachner II*, they argued that the bid-rigging schemes alleged in their indictments were but a single conspiracy. The District Court denied the motion, concluding that respondents' earlier guilty pleas were an admission of the Government's allegations of

two conspiracies, an admission that foreclosed and concluded new arguments to the contrary. Nos. 81–20119–01 and 82–20011–01 (Kan., Nov. 18, 1983), App. to Pet. for Cert. 112a.

A panel of the Court of Appeals for the Tenth Circuit reversed. 753 F. 2d 811 (1985). That judgment was vacated and the case reheard en banc. Citing our decisions in *Blackledge* v. *Perry*, 417 U. S. 21 (1974), and *Menna* v. *New York*, 423 U. S. 61 (1975) *(per curiam)*, a divided en banc court concluded that respondents were entitled to draw upon factual evidence outside the original record, including the *Beachner II* findings, to support the claim of a single conspiracy. 781 F. 2d 792 (1986). The en banc court rejected the Government's argument that respondents had waived the right to raise their double jeopardy claim by pleading guilty, holding that the Double Jeopardy Clause "does not constitute an individual right which is subject to waiver." *Id.*, at 795. It further rejected the Government's contention that respondents' guilty pleas must be construed as admissions that there had been separate conspiracies. The Court of Appeals observed that the indictments did not "specifically allege separate conspiracies," and held that "the admissions of factual guilt subsumed in the pleas of guilty go only to the acts constituting the conspiracy and not to whether one or more conspiracies existed." *Id.*, at 796.

On remand, the District Court, citing *Beachner II*, concluded that the indictments merely charged different aspects of the same conspiracy to restrain competition. It vacated the judgments and sentences entered against both respondents on the second indictment. Nos. 81–20119–01 and 82–20011–01 (Kan., June 30, 1986), App. to Pet. for Cert. 5a. In its decision on appeal from that judgment, the Court of Appeals noted that our intervening decision in *Ricketts* v. *Adamson*, 483 U. S. 1 (1987), made clear that the protection against double jeopardy is subject to waiver. Nonetheless, it concluded that while *Ricketts* invalidated the broader rationale underlying its earlier en banc opinion that double jeopardy protections could not be waived, it left intact its

narrower holding that the guilty pleas in this case did not themselves constitute such waivers. It then held that the District Court's finding of a single conspiracy was not clearly erroneous, and affirmed. Nos. 86–2166 and 86–2202 (CA10, Aug. 18, 1987), App. to Pet. for Cert. 1a. We granted certiorari, 485 U. S. 903 (1988).

## II

A plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence. Accordingly, when the judgment of conviction upon a guilty plea has become final and the offender seeks to reopen the proceeding, the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary. If the answer is in the affirmative then the conviction and the plea, as a general rule, foreclose the collateral attack. There are exceptions where on the face of the record the court had no power to enter the conviction or impose the sentence. We discuss those exceptions below and find them inapplicable. The general rule applies here to bar the double jeopardy claim.

### A

The Government's petition for certiorari did not seek review of the determination that the bid-rigging described in the two *Broce* indictments was part of one overall conspiracy. Instead, the Government challenges the theory underlying the en banc judgment in the Court of Appeals that respondents were entitled, notwithstanding their earlier guilty pleas, to a factual determination on their one-conspiracy claim. That holding was predicated on the court's view that, in pleading guilty, respondents admitted only the acts described in the indictments, not their legal consequences. As the indictments did not include an express statement that the two conspiracies were separate, the Court of Appeals reasoned, no such concession may be inferred from the pleas.

In holding that the admissions inherent in a guilty plea "go only to the acts constituting the conspiracy," 781 F. 2d, at 796, the Court of Appeals misapprehended the nature and effect of the plea. A guilty plea "is more than a confession which admits that the accused did various acts." *Boykin* v. *Alabama*, 395 U. S. 238, 242 (1969). It is an "admission that he committed the crime charged against him." *North Carolina* v. *Alford*, 400 U. S. 25, 32 (1970). By entering a plea of guilty, the accused is not simply stating that he did the discrete acts described in the indictment; he is admitting guilt of a substantive crime. That is why the defendant must be instructed in open court on "the nature of the charge to which the plea is offered," Fed. Rule Crim. Proc. 11(c)(1), and why the plea "cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts," *McCarthy* v. *United States*, 394 U. S. 459, 466 (1969).

Just as a defendant who pleads guilty to a single count admits guilt to the specified offense, so too does a defendant who pleads guilty to two counts with facial allegations of distinct offenses concede that he has committed two separate crimes. The *Broce* indictments alleged two distinct agreements: the first, an agreement beginning in April 1978 to rig bids on one specified highway project, and the second, an agreement beginning 15 months later to rig bids on a different project. The Court of Appeals erred in concluding that because the indictments did not explicitly state that the conspiracies were separate, respondents did not concede their separate nature by pleading guilty to both. In a conspiracy charge, the term "agreement" is all but synonymous with the conspiracy itself, and as such has great operative force. We held in *Braverman* v. *United States*, 317 U. S. 49, 53 (1942), that "[t]he gist of the crime of conspiracy as defined by the statute is the agreement . . . to commit one or more unlawful acts," from which it follows that "the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects." A single agreement to commit several crimes

constitutes one conspiracy. By the same reasoning, multiple agreements to commit separate crimes constitute multiple conspiracies. When respondents pleaded guilty to two charges of conspiracy on the explicit premise of two agreements which started at different times and embraced separate objectives, they conceded guilt to two separate offenses.*

Respondents had the opportunity, instead of entering their guilty pleas, to challenge the theory of the indictments and to attempt to show the existence of only one conspiracy in a trial-type proceeding. They chose not to, and hence relinquished that entitlement. In light of *Beachner*, respondents may believe that they made a strategic miscalculation. Our precedents demonstrate, however, that such grounds do not justify setting aside an otherwise valid guilty plea.

In *Brady* v. *United States*, 397 U. S. 742 (1970), the petitioner had been charged with kidnaping in violation of what was then 18 U. S. C. § 1201(a) (1964 ed.). He entered a knowing and voluntary plea of guilty. Nine years after the plea, we had held in *United States* v. *Jackson*, 390 U. S. 570

---

*That is certainly how all participants viewed the indictments at the time. As noted earlier, see *supra*, at 565, respondents acknowledged in their plea agreements that they were subject to receiving separate sentences for each offense to which they were pleading. Furthermore, the District Judge informed Broce at the Rule 11 hearing of the maximum punishment "on each charge," and Broce stated that he understood. App. 36. Prior to sentencing, the Government prepared an "Official Version of the Offense" for inclusion in the presentence report which stated that there were "two separate conspiracies" giving rise to the indictments. *Id.,* at 51. At his sentencing hearing, Broce was given an opportunity to state "any dispute with what the government has included in the pre-sentence report about the official version of the offense," and did not dispute the statement that the conspiracies were separate ones. *Id.,* at 63–64. We do not suggest that any of these events are necessary to our holding that respondents have forfeited the opportunity to dispute the separate nature of the conspiracies; on the contrary, the guilty pleas are alone a sufficient basis for that conclusion. We review these incidents simply to note that our reading of the indictments is the necessary one, and was shared by all participants to the plea proceedings at the time the pleas were entered.

(1968), that the provision of § 1201(a) providing for a death penalty only upon the recommendation of the jury was unconstitutional. This was of no avail to Brady, however, because the possibility that his plea might have been influenced by an erroneous assessment of the sentencing consequences if he had proceeded to trial did not render his plea invalid. We observed:

> "A defendant is not entitled to withdraw his plea merely because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action. More particularly, absent misrepresentation or other impermissible conduct by state agents, a voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise." 397 U. S., at 757 (citation omitted).

Similarly, we held in *McMann* v. *Richardson*, 397 U. S. 759 (1970), that a counseled defendant may not make a collateral attack on a guilty plea on the allegation that he misjudged the admissibility of his confession. "Waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts." *Id.*, at 770. See also *Tollett* v. *Henderson*, 411 U. S. 258, 267 (1973) ("[J]ust as it is not sufficient for the criminal defendant seeking to set aside such a plea to show that his counsel in retrospect may not have correctly appraised the constitutional significance of certain historical facts, it is likewise not sufficient that he show that if counsel had pursued a certain factual inquiry such a pursuit would have uncovered a possible constitutional infirmity in the proceedings") (citation omitted).

Respondents have submitted the affidavit of Kenneth F. Crockett, who served as their attorney when their pleas were entered. App. 72–73. Crockett avers that he did not

discuss double jeopardy issues with respondents prior to their pleas, and that respondents had not considered the possibility of raising a double jeopardy defense before pleading. Respondents contend that, under these circumstances, they cannot be held to have waived the right to raise a double jeopardy defense because there was no "intentional relinquishment or abandonment of a known right or privilege." *Johnson* v. *Zerbst*, 304 U. S. 458, 464 (1938).

Our decisions have not suggested that conscious waiver is necessary with respect to each potential defense relinquished by a plea of guilty. Waiver in that sense is not required. For example, the respondent in *Tollett* pleaded guilty to first-degree murder, and later filed a petition for habeas corpus contending that his plea should be set aside because black citizens had been excluded from the grand jury that indicted him. The collateral challenge was foreclosed by the earlier guilty plea. Although at the time of the indictment the facts relating to the selection of the grand jury were not known to respondent and his attorney, we held that to be irrelevant:

> "If the issue were to be cast solely in terms of 'waiver,' the Court of Appeals was undoubtedly correct in concluding that there had been no such waiver here. But just as the guilty pleas in the *Brady* trilogy were found to foreclose direct inquiry into the merits of claimed antecedent constitutional violations there, we conclude that respondent's guilty plea here alike forecloses independent inquiry into the claim of discrimination in the selection of the grand jury." 411 U. S., at 266.

See also *Menna*, 423 U. S., at 62, n. 2 ("[W]aiver was not the basic ingredient of this line of cases").

The Crockett affidavit, as a consequence, has no bearing on whether respondents' guilty plea served as a relinquishment of their opportunity to receive a factual hearing on a double jeopardy claim. Relinquishment derives not from any inquiry into a defendant's subjective understanding of the range of potential defenses, but from the admissions neces-

sarily made upon entry of a voluntary plea of guilty. The trial court complied with Rule 11 in ensuring that respondents were advised that, in pleading guilty, they were admitting guilt and waiving their right to a trial of any kind. A failure by counsel to provide advice may form the basis of a claim of ineffective assistance of counsel, but absent such a claim it cannot serve as the predicate for setting aside a valid plea.

In sum, as we explained in *Mabry* v. *Johnson*, 467 U. S. 504, 508 (1984), "[i]t is well settled that a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked." That principle controls here. Respondents have not called into question the voluntary and intelligent character of their pleas, and therefore are not entitled to the collateral relief they seek.

## B

An exception to the rule barring collateral attack on a guilty plea was established by our decisions in *Blackledge* v. *Perry*, 417 U. S. 21 (1974), and *Menna* v. *New York*, *supra*, but it has no application to the case at bar.

The respondent in *Blackledge* had been charged in North Carolina with the state-law misdemeanor of assault with a deadly weapon. Pursuant to state procedures, he was tried in the county District Court without a jury, but was permitted, once he was convicted, to appeal to the county Superior Court and obtain a trial *de novo*. After the defendant filed an appeal, the prosecutor obtained an indictment charging felony assault with a deadly weapon with intent to kill and inflict serious bodily injury. The defendant pleaded guilty. We held that the potential for prosecutorial vindictiveness against those who seek to exercise their right to appeal raised sufficiently serious due process concerns to require a rule forbidding the State to bring more serious charges against defendants in that position. The plea of guilty did not foreclose a subsequent challenge because in *Blackledge*, unlike in *Brady* and *Tollett*, the defendant's right was "the

right not to be haled into court at all upon the felony charge. The very initiation of proceedings against him . . . thus operated to deny him due process of law." 417 U. S., at 30–31.

The petitioner in *Menna* had refused, after a grant of immunity, to obey a court order to testify before a grand jury. He was adjudicated in contempt of court and sentenced to a term in civil jail. After he was released, he was indicted for the same refusal to answer the questions. He pleaded guilty and was sentenced, but then appealed on double jeopardy grounds. The New York Court of Appeals concluded that Menna had waived his double jeopardy claim by pleading guilty. We reversed, citing *Blackledge* for the proposition that "[w]here the State is precluded by the United States Constitution from haling a defendant into court on a charge, federal law requires that a conviction on that charge be set aside even if the conviction was entered pursuant to a counseled plea of guilty." 423 U. S., at 62. We added, however, an important qualification:

> "We do not hold that a double jeopardy claim may never be waived. We simply hold that a plea of guilty to a charge does not waive a claim that—*judged on its face*—the charge is one which the State may not constitutionally prosecute." *Id.*, at 63, n. 2 (emphasis added).

In neither *Blackledge* nor *Menna* did the defendants seek further proceedings at which to expand the record with new evidence. In those cases, the determination that the second indictment could not go forward should have been made by the presiding judge at the time the plea was entered on the basis of the existing record. Both *Blackledge* and *Menna* could be (and ultimately were) resolved without any need to venture beyond that record. In *Blackledge*, the concessions implicit in the defendant's guilty plea were simply irrelevant, because the constitutional infirmity in the proceedings lay in the State's power to bring any indictment at all. In *Menna*, the indictment was facially duplicative of the earlier offense of which the defendant had been convicted and sen-

tenced so that the admissions made by Menna's guilty plea could not conceivably be construed to extend beyond a redundant confession to the earlier offense.

Respondents here, in contrast, pleaded guilty to indictments that on their face described separate conspiracies. They cannot prove their claim by relying on those indictments and the existing record. Indeed, as noted earlier, they cannot prove their claim without contradicting those indictments, and that opportunity is foreclosed by the admissions inherent in their guilty pleas. We therefore need not consider the degree to which the decision by an accused to enter into a plea *bargain* which incorporates concessions by the Government, such as the one agreed to here, heightens the already substantial interest the Government has in the finality of the plea. The judgment of the Court of Appeals is

*Reversed.*

## APPENDIX TO OPINION OF THE COURT

*Excerpts from Indictments*

## "UNITED STATES DISTRICT COURT DISTRICT OF KANSAS

"Criminal No. 81-20119-01

"UNITED STATES OF AMERICA
*v.*
BROCE CONSTRUCTION CO., INC., RAY C. BROCE,
AND GERALD R. GUMM, DEFENDANTS

"[Filed: Nov. 17, 1981]

"V

"OFFENSE CHARGED

"11. Beginning sometime in or about April, 1978, and continuing thereafter, the exact dates being to this grand jury unknown, in the District of Kansas, Ray C. Broce, Gerald R. Gumm and Broce Construction Co., Inc., defendants herein, and others known and unknown, entered into and engaged in a combination and conspiracy to suppress and eliminate competition for the construction of Project No. 23-60-RS-1080(9) let by the State of Kansas on April 25, 1978, which contract involved construction work on a Federal-Aid highway in the State of Kansas, in unreasonable restraint of the above-described interstate trade and commerce in violation of Title 15, United States Code, Section 1, commonly known as the Sherman Act.

"12. The aforesaid combination and conspiracy consisted of an agreement, understanding and concert of action among the defendants and co-conspirators, the substantial terms of which were:

"(a) To allocate to Broce Construction Co., Inc., Project No. 23-60-RS-1080(9) let by the State of Kansas on April 25, 1978; and

"(b) To submit collusive, noncompetitive, and rigged bids to the State of Kansas in connection with the above-referenced Federal-Aid highway project.

"13. For the purpose of forming and effectuating the aforesaid combination and conspiracy, the defendants and co-conspirators have done those things which, as hereinbefore charged, they have combined and conspired to do, including:

"(a) Discussing the submission of prospective bids on the above-described project let by the State of Kansas, Project No. 23-60-RS-1080(9);

"(b) Designating the successful low bidder on the above-referenced Federal-Aid highway project;

"(c) Submitting intentionally high or complementary bids on the above-referenced Federal-Aid highway project on

which Broce Construction Co., Inc. had been designated as the successful low bidder;

"(d) Submitting bid proposals on the above-referenced Federal-Aid highway project containing false, fictitious and fraudulent statements and entries; and

"(e) Discussing the submission of prospective bids on other projects let by the State of Kansas on April 25, 1978."

## "IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

"Criminal No. 82-20011

"UNITED STATES OF AMERICA
*v.*
RAY C. BROCE AND BROCE CONSTRUCTION CO., INC., DEFENDANTS.

"[Filed: Feb. 4, 1982]

·      ·      ·      ·      ·

"V

## "OFFENSE CHARGED

"10.   Beginning sometime in or about July, 1979, and continuing thereafter, the exact dates being to this grand jury unknown, in the District of Kansas, Ray C. Broce and Broce Construction Co., Inc., defendants herein, and others known and unknown, entered into and engaged in a combination and conspiracy to suppress and eliminate competition for the construction of Project No. KRL 29–2(26) let by the State of Kansas on July 17, 1979, which contract involved construction work on a public highway in the State of Kansas, in un-

reasonable restraint of the above-described interstate trade and commerce in violation of Title 15, United States Code, Section 1, commonly known as the Sherman Act.

"11. The aforesaid combination and conspiracy consisted of an agreement, understanding and concert of action among the defendants and co-conspirators, the substantial terms of which were:

"(a) To allocate to Broce Construction Co., Inc., Project No. KRL 29-2(26) let by the State of Kansas on July 17, 1979; and

"(b) To submit collusive, noncompetitive, and rigged bids to the State of Kansas in connection with the above-referenced public highway construction project.

"12. For the purpose of forming and effectuating the aforesaid combination and conspiracy, the defendants and co-conspirators have done those things which, as hereinbefore charged, they have combined and conspired to do, including:

"(a) Discussing the submission of prospective bids on the above-described project let by the State of Kansas, Project No. KRL 29-2(26);

"(b) Designating the successful low bidder on the above-referenced public highway construction project;

"(c) Submitting intentionally high or complementary bids on the above-referenced public highway construction project on which Broce Construction Co., Inc. had been designated as the successful low bidder;

"(d) Submitting bid proposals on the above-referenced public highway construction project containing false, fictitious and fraudulent statements and entries; and

"(e) Discussing the payment of consideration of value to another contractor to induce that contractor to submit a noncompetitive, rigged bid on the above-referenced public highway construction project."

JUSTICE STEVENS, concurring.

While I join the Court's opinion, I write separately to identify the doubtful character of the basic premise on which respondents' double jeopardy claim rests. Respondents assume that their price-fixing activities in April 1978 and July 1979 were not separate crimes because they were carried out pursuant to an overarching conspiracy that had been in existence for more than 25 years.

"A conspiracy is a partnership in criminal purposes." *United States* v. *Kissel*, 218 U. S. 601, 608 (1910). It "does not become several conspiracies because it continues over a period of time" or because it is an "agreement to commit several offenses." *Braverman* v. *United States*, 317 U. S. 49, 52 (1942). Thus, the continuous, cooperative effort among Kansas highway contractors to rig bids, which permeated the Kansas highway construction industry for more than 25 years, see *ante*, at 567, was unquestionably a single, continuing conspiracy that violated § 1 of the Sherman Act, 15 U. S. C. § 1. It does not necessarily follow, however, that separate bid-rigging arrangements carried out in furtherance of an illegal master plan may not be prosecuted separately.

All of the elements of a Sherman Act violation were alleged in the indictment charging respondents with price fixing on the Kansas highway project bid on April 25, 1978. App. 143a–151a. The same is true with respect to the indictment relating to the second project, bid more than a year later and to be performed in a different county. *Id.*, at 136a–142a. Each indictment alleged a separate crime. I am not at all sure that the fact that both may have been committed pursuant to still another continuing violation of the Sherman Act should bar separate prosecutions for each of those violations.

There is something perverse in the assumption that respondents' constitutional rights may have been violated by separately prosecuting them for each of two complete and flagrant violations of the Sherman Act simply because they may also have been guilty of an ongoing and even more serious vi-

olation of the same statute for more than a quarter of a century. Whether the law requires that all of these violations be merged into one is a question that need not be decided in this case. Yet I believe there is value in making it clear that the Court has not decided that question today.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

A guilty plea, for all its practical importance in the day-to-day administration of justice, does not bestow on the Government any power to prosecute that it otherwise lacks. Here, after remand, the District Court found, and the Court of Appeals affirmed, that the two indictments brought against respondents charged two parts of the same conspiracy, and therefore sought to punish respondents twice for the same behavior, in violation of the Double Jeopardy Clause of the Fifth Amendment.

The Government, see *ante*, at 569, does not contest the finding that in fact there was only one conspiracy. It argues, however, that the defendants' guilty pleas render this fact wholly irrelevant, and urges us to let stand convictions that otherwise are barred. Because I believe it inappropriate for a reviewing court to close its eyes to this constitutional violation, and because I find that the basis of respondents' double jeopardy challenge is obvious from a reading of the two indictments and entitles respondents to a hearing, I dissent from the majority's ruling that the guilty pleas are conclusive.

I

As noted in *Brady*[1] and by the majority today, in most instances a guilty plea is conclusive and resolves all factual issues necessary to sustain a conviction. But in *Blackledge* v. *Perry*, 417 U. S. 21 (1974), and in *Menna* v. *New York*, 423 U. S. 61 (1975), this Court unequivocally held that a guilty

---

[1] *Brady* v. *United States*, 397 U. S. 742, 748 (1970); see also *McMann* v. *Richardson*, 397 U. S. 759, 766 (1970).

plea does not waive a defendant's right to contest the constitutionality of a conviction "[w]here the State is precluded by the United States Constitution from haling a defendant into court." *Id.*, at 62; see also *Blackledge*, 417 U. S., at 30. Although our recent decision in *Ricketts* v. *Adamson*, 483 U. S. 1 (1987), allows a defendant to waive a double jeopardy claim as part of a clearly worded plea agreement, none of our prior cases limited a defendant's ability, under *Menna* and *Blackledge*, absent an express waiver, to challenge the Government's authority to bring a second charge.

It is true, as the majority notes, that neither *Blackledge* nor *Menna* involved an independent evidentiary hearing to assess the defendants' double jeopardy claims. But nothing in *Blackledge* or *Menna* indicates that the general constitutional rule announced in those cases was dependent on the fortuity that the defendants' double jeopardy claims were apparent from the records below without resort to an evidentiary hearing. This is not surprising. There simply was no need for an evidentiary hearing in either *Blackledge* or *Menna*. Certainly, nothing in those cases suggests that a collateral proceeding would be inappropriate. *Blackledge* was a habeas proceeding in which the record was already fully developed, 417 U. S., at 23; and the remand in *Menna* from this Court to the New York Court of Appeals was not limited in any way, 423 U. S., at 63. To the extent that the majority reads the particular circumstances of those cases as compelling, or even implying, that the need for an evidentiary hearing alters the effect of a guilty plea, it infuses mere happenstance with constitutional meaning and draws distinctions where none belong.

The majority also justifies its outcome by looking to four words of *dicta* in a footnote in *Menna*, 423 U. S., at 62–63, n. 2. The relevant language in the *Menna* footnote is: "[A] plea of guilty to a charge does not waive a claim that—*judged on its face*—the charge is one which the State may not constitutionally prosecute" (emphasis added). The majority

takes this language to mean that respondents can prevail only if they prove their claim by relying on nothing more than the indictment and the record.

A much better reading of the *Menna* footnote, however, is to place the emphasis on the word "claim." Accordingly, if a claim that the Government was without power to prosecute is apparent on the face of the indictment, read in light of the existing record, a court should not consider the claim to have been waived, and must go on to consider its merits. This interpretation is true to the outcome in both *Menna* and *Blackledge*. It also gives appropriate force to the footnote's language and its apparent purpose of placing some limit on the ability of a defendant who has pleaded guilty to make a later collateral attack without some foundation in the prior proceedings. Most important, it gives real content to the defendants' constitutional rights.

## II

This case provides a powerful example of why there is an especially great need to maintain the right collaterally to attack guilty pleas in the conspiracy context. Conspiracy, that "elastic, sprawling and pervasive offense," *Krulewitch* v. *United States*, 336 U. S. 440, 445 (1949) (Jackson, J., concurring in judgment and opinion of Court), long has been recognized as difficult to define and even more difficult to limit. When charging a conspiracy, a prosecutor is given the opportunity to "cast his nets" in order to cover a broad timeframe and numerous acts and individuals, in part because conspiracies by their nature are clandestine and difficult to uncover. See, *e. g.*, *Blumenthal* v. *United States*, 332 U. S. 539, 557 (1947). But this very permissible breadth of conspiracy indictments provides potential for abuse and confusion. Judge Parker said it meaningfully 50 years ago:

> "Blanket charges of 'continuing' conspiracy with named defendants and with 'other persons to the grand jurors unknown' fulfil a useful purpose in the prosecution

of crime, but they must not be used in such a way as to contravene constitutional guaranties. If the government sees fit to send an indictment in this general form charging a continuing conspiracy for a period of time, it must do so with the understanding that upon conviction or acquittal further prosecution of that conspiracy during the period charged is barred, and that this result cannot be avoided by charging the conspiracy to have been formed in another district where overt acts in furtherance of it were committed, or by charging different overt acts as having been committed in furtherance of it, or by charging additional objects or the violation of additional statutes as within its purview, if in fact the second indictment involves substantially the same conspiracy as the first. . . . The constitutional provision against double jeopardy is a matter of substance and may not be thus nullified by the mere forms of criminal pleading." *Short* v. *United States*, 91 F. 2d 614, 624 (CA4 1937).

This Court noted in *Sanabria* v. *United States*, 437 U. S. 54, 65–66 (1978): "The precise manner in which an indictment is drawn cannot be ignored, because an important function of the indictment is to ensure that, 'in case any other proceedings are taken against [the defendant] for a similar offense, . . . the record [will] sho[w] with accuracy to what extent he may plead a former acquittal or conviction,'" quoting *Cochran* v. *United States*, 157 U. S. 286, 290 (1895). See also *Russell* v. *United States*, 369 U. S. 749 (1962).

As the Court of Appeals recognized, the two indictments at issue here were broad and vague and substantially overlapped. Although the majority has included in the Appendix to its opinion, *ante*, p. 576, the few paragraphs in the two indictments which differ, it fails to acknowledge that the indictments otherwise are almost identical.

The indictments alleged acts occurring in the same place, having the same object of eliminating competition on a high-

way project, and having the same effect of restraining competition. More important, the first indictment is vague and open-ended in a number of material respects. While alleging a definite beginning date, the first indictment specified no termination date. As a consequence, the acts alleged in the second indictment were contained within the timeframe of the first. Moreover, the first indictment alleged that respondents conspired with "others known and unknown"; so, too, did the second indictment. Both indictments, therefore, may have involved the same participants. This vagueness, coupled with the express identical elements, provides a strong inference that the two agreements alleged were part of the same conspiracy.[2] For this reason alone, there are sufficient grounds for raising a double jeopardy challenge under a proper reading of our decisions in Menna and Blackledge.

That the two indictments were duplicitous is further betrayed by the nature of the charged offense. The indictments state that the conspirators designated a low bidder on each project, submitted artificially high or complementary bids, and discussed paying consideration to other contractors to induce those contractors to submit noncompetitive rigged bids as well. Ante, at 577–578, 579. Although it is theoretically possible that such a conspiracy might involve only one project, it is highly unlikely. Rather, it seems reasonably clear to me, as it should have been to the Government, that in order to make any sense such an agreement must involve a number of projects, so that a conspirator who agreed to sub-

---

[2] In determining how many conspiracies are involved in a particular case, courts have looked to a number of discrete factors. Some of these include the relevant (1) time, (2) participants, (3) statutory offenses charged, (4) overt acts charged, and (5) places where the alleged acts took place. See United States v. Ragins, 840 F. 2d 1184, 1188–1189 (CA4 1988); United States v. Atkins, 834 F. 2d 426, 432 (CA5 1987); see also United States v. Korfant, 771 F. 2d 660, 662 (CA2 1985) (considering eight factors).

mit a sham bid on one project would be rewarded by being chosen for the successful bid on another project. In fact, a Justice Department release issued several weeks after the second indictment was filed described a Tennessee highway bid-rigging scheme as follows: "'The prearranged low bidder would usually get the job as other contractors submitted intentionally high bids, knowing their turn as low bidder was coming.'" 42 BNA Antitrust & Trade Regulation Rep. 523 (1982), quoting unpublished release. See generally U. S. General Accounting Office, Report to the House Committee on Public Works and Transportation, Actions Being Taken to Deal with Bid Rigging in the Federal Highway Program (May 23, 1983). The very nature of the conspiracy alleged all but compels the conclusion that the initial indictment charged an ongoing agreement covering numerous projects.[3]

The Government argues that the respondents should have realized all this, and refused to plead to the second indictment. I agree. But it is no less true that the Government should have been aware that it could be charging duplicitous conspiracies, and, if so, not brought the second indictment. I fail to see why a reviewing court should punish the respondents' oversight, but reward the Government's.

"'The Double Jeopardy Clause is not such a fragile guarantee that . . . its limitations [can be avoided] by the simple expedient of dividing a single crime into a series of temporal or spatial units.'" *Sanabria* v. *United States,* 437 U. S., at 72, quoting *Brown* v. *Ohio,* 432 U. S. 161, 169 (1977). As we pointed out in *Braverman* v. *United States,* 317 U. S. 49, 52 (1942), there may be a "single continuing agreement to com-

---

[3] The majority's reading of the indictments appears to focus solely on the fact that each states a separate agreement, relating to a separate project. See *ante,* at 570–571. Had the majority reached the issue raised by JUSTICE STEVENS, in his separate concurring opinion, *ante,* p. 580, and decided that multiple conspiracies within an ongoing conspiracy could be prosecuted separately, then those allegations might be determinative. The majority, however, has not done this.

mit several offenses." On the face of the two indictments, there was clear support for a claim that prosecuting the second indictment was barred by double jeopardy.

## III

The question remains as to what procedures a reviewing court should follow when faced with such a double jeopardy claim.

As noted above, our prior cases and common sense require that the reviewing court consider the record in determining whether the claim of double jeopardy is sufficient to bar the second prosecution. It may be that in most cases the issue can be determined by reference to the record alone. Statements made at the plea hearing or other pretrial proceeding may be sufficient to clarify any ambiguity, or may constitute an express waiver of any double jeopardy challenge. But in the absence of a definitive record, an evidentiary hearing may be necessary in order to assure that the questioned indictment in fact alleges separate criminal conduct.

An evidentiary hearing on the double jeopardy issue would not be overly burdensome or replicate the trial that the guilty plea avoided. As noted in *Abney* v. *United States*, 431 U. S. 651, 659 (1977), in a claim of double jeopardy "the defendant makes no challenge whatsoever to the merits of the charge against him." Although the nature of the evidentiary hearing obviously will depend on the facts of the particular case, for a challenge similar to the one here the hearing probably would involve only the Government's explanation of how the conduct charged in the second indictment differs from the facts established by the guilty plea to the first indictment, and the defendants' arguments to the contrary. The truth of many of the relevant facts will have been established by the guilty plea to the first indictment, and the legal sufficiency and independence of the second indictment should be determin-

able without substantial additional testimony.[4]  These challenges rarely should involve extensive proceedings.

The Government's complaint that conducting an evidentiary hearing will present it with problems of proof, as well as administrative headaches, may have a modicum of force. Every prosecutor, however, has the power to avoid this by more carefully considering the actual scope of the alleged conspiracy, and by carefully drawing the indictment.  The prosecutor also may ensure that any double jeopardy concerns are addressed at the plea hearing by describing with some particularity the scope of the agreement that is the basis of the conspiracy.[5]  While such steps are not absolutely required, each makes good sense, and would help to assure that every issue that should be raised at the plea hearing will be raised.  Directly addressing double jeopardy questions at the plea hearing will prevent situations like the one at issue here.  Once on notice, a defendant might expressly waive any double jeopardy challenge, see *Ricketts* v. *Adamson*, 483 U. S. 1 (1987), or might reconsider his inclination to plead guilty and, instead, litigate the issue.

This solution, it seems to me, properly balances the interests of the Government in finality of convictions pursuant to guilty pleas with those of criminal defendants who may have been unaware of their rights when pleading guilty.  The Constitution's prohibition against placing a defendant in jeopardy twice for the same conduct is fundamental, and no less applicable because a complicated question of conspiracy law

---

[4] Indeed, we know already that this case did not require a long, complicated hearing.  By the Government's stipulation, the District Court considered the record in the *Beachner* case, see *ante*, at 566–567, as if that record had been a part of the plea proceedings.

[5] It would also be worthwhile for the Government to provide a defendant with a copy of each indictment well in advance of the scheduled plea hearing.  Here the defendants first received a copy of the second indictment on February 8, 1981, the same day on which the guilty pleas were entered.  This may have contributed to respondents' failure to raise the double jeopardy issue at that time.

may be presented. Because I believe that there is no legitimate interest in either punishing defendants twice for the same conduct or in allowing the Government to gain untoward benefits from the use of vague and imprecise indictments, and that an evidentiary hearing would not be a significant burden in the few cases where it would be necessary, I dissent.