UNITED STATES of America, Plaintiff–Appellee,

v.

John A. SEYBOLD, also known as Richard O'Callaghan, Defendant–Appellant.

No. 90–2596.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 25, 1992.

Decided Nov. 10, 1992.

Lance C. Malina, Asst. U.S. Atty. (argued), Office of U.S. Atty., Crim. Div., Barry R. Elden, Asst. U.S. Atty., Office of U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Margaret L. Paris, Cotsirilos, Stephenson, Tighe & Streicker, Chicago, Ill. (argued), for defendant-appellant.

Before CUDAHY, COFFEY, and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

On July 27, 1989, John A. Seybold was indicted for federal criminal law violations in connection with his participation in a series of jewel thefts. Mr. Seybold elected to represent himself. Over Mr. Seybold's objection, the district court appointed standby counsel to assist him. On April 17, 1990, Mr. Seybold pleaded guilty to one count in the indictment, which alleged a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) under 18 U.S.C. § 1962(c). The government then moved to dismiss the remaining counts against Mr. Seybold. After a full hearing, conducted in accordance with Rule 11 of the Federal Rules of Criminal Procedure, the district court accepted Mr. Seybold's guilty plea and entered a judgment of conviction. On direct appeal from that judgment, Mr. Seybold challenges his conviction on the ground that his Sixth Amendment right to self-representation was denied by standby counsel's interference in his case. We believe that Mr. Seybold waived his Sixth Amendment claim by pleading guilty and that his plea was both knowing and voluntary. Accordingly, we affirm the district court's judgment of conviction.

## I

## BACKGROUND

### A. Facts

In 1987, John A. Seybold was indicted by a federal grand jury on several counts stemming from his involvement with the "Dell Organization" in a series of jewelry thefts. The Dell Organization was allegedly run by Mr. Seybold's ex-wife, Ruth Dell, and included their son and at least three other people. Mr. Seybold pleaded guilty to two counts in the indictment: robbery and conspiracy to commit robbery, and interstate transportation of stolen goods. On December 3, 1987, Mr. Seybold was sentenced to twelve years' imprisonment and five years' probation.

Two years later, on July 27, 1989, while Mr. Seybold was serving his twelve-year sentence in Lewisburg, Pennsylvania, the government filed a second indictment against him and his alleged co-conspirators. Seven of the eighteen counts in the indictment were directed at either subgroups that included Mr. Seybold or named Mr. Seybold alone, including the first two counts: (1) conspiracy to conduct the affairs of the Dell Organization through a pattern of racketeering activity, in violation of section 1962(d) of RICO, 18 U.S.C. § 1962(d), and (2) actually conducting the affairs of the Dell Organization through a pattern of racketeering activity, in violation of section 1962(c) of RICO, 18 U.S.C. § 1962(c).[1] The principal evidence relied upon by the government was a set of approximately 200 audio tapes ("the tapes"). According to the government, only one-third of the tapes implicated Mr. Seybold.

Mr. Seybold was transferred to the Metropolitan Correctional Center (MCC), in Chicago, to facilitate the prosecution. On Au-

---

**1.** A superseding indictment was filed on December 5, 1989, with no changes material to the present appeal.

gust 31, 1989, Mr. Seybold was arraigned in federal district court and pleaded not guilty to all charges. Mr. Seybold made it clear that he wished to proceed pro se. The court appointed standby counsel despite Mr. Seybold's insistence that he did not want or need any legal assistance. Nonetheless, on October 6, 1989, Mr. Seybold and his standby counsel appeared at a status hearing, and Mr. Seybold informed the court that they had worked out a cooperative arrangement:

> Well, as [standby counsel] said to you and as I agree or affirm his position, he said he would be glad to sit by and give me whatever advice I require. There are certain things that I will have to have done that he is willing to do. . . .

Tr. of Oct. 6, 1989 at 5. At this hearing, the court also ordered the prosecutor ·to turn over certain discovery materials, including the tapes, to standby counsel, who was to relay the information to Mr. Seybold. Mr. Seybold objected to this arrangement and asked that the materials be delivered directly to him, but the court insisted the discovery materials be delivered to standby counsel.

Mr. Seybold had difficulty obtaining access to the tapes. By October 24, 1989, the prosecutor had delivered a complete set of tapes to an attorney representing one of Mr. Seybold's co-defendants. This attorney had been designated to act for all the defendants for purposes of channelling discovery material from the prosecutor. At a status hearing on November 29, 1989, Mr. Seybold informed the court that he still had not had access to the tapes. The court suggested to standby counsel that he make arrangements to obtain the tapes from the co-defendants' representative and deliver them to Mr. Seybold. By January 26, 1990, a complete set of transcripts of the tapes had also been delivered to the co-defendants' representative. However, on that day, Mr. Seybold's standby counsel filed a motion on behalf of Mr. Seybold and two of his co-defendants, each of whom was detained at the MCC, stating that the MCC

was not allowing counsel to take audiotapes or listening equipment into the MCC. Instead, the MCC required use of its own storage facilities and listening equipment that could be used if the government would deliver tapes to the MCC. The motion requested the court to enter a formal order directing the prosecutor to provide a copy of the tapes directly to the MCC. At a status hearing that day, January 26, 1990, the court declined to enter a formal order, but directed the co-defendants' representative to give the prosecutor all the tapes that the attorneys had finished listening to so that they could be delivered to the MCC.

Another status hearing was held on February 8, 1990. Mr. Seybold was not present, but the court held the hearing in his absence because his standby counsel was present.[2] The court was informed that the co-defendants' representative had given back to the prosecutor a portion of the tapes, and that those tapes were in the process of being transferred to the MCC. Trial was set for April 18, 1990. At a status hearing on March 29, 1990, Mr. Seybold acknowledged access to forty of the tapes but complained that the remainder had not yet been made available to him. On April 12, 1990, Mr. Seybold's standby counsel filed a motion on behalf of Mr. Seybold requesting that the trial be continued because the complete set of tapes or transcripts had been delivered on April 8, which was too late to allow proper preparation for the scheduled April 18 trial. The next scheduled status hearing, scheduled for April 13, was continued to April 17 upon Mr. Seybold's motion to continue for religious reasons.

At a status hearing on the morning of April 17, 1990, Mr. Seybold informed the court that he wished to change his plea in connection with a plea agreement, which was being prepared. By this time, all of his co-defendants had already pleaded guilty. He was facing trial by himself with perhaps some of his co-defendants as opposing witnesses. That afternoon, the par-

---

**2.** There were thirteen status hearings, the first on September 13, 1989, and the last on April 17, 1990. At four of the hearings, Mr. Seybold was not present but was represented by standby counsel.

ties filed with the court a written plea agreement in which Mr. Seybold agreed to plead guilty to Count Two of the indictment (the substantive RICO violation), and the government agreed to dismiss the remaining counts pending against Mr. Seybold. After a lengthy examination of Mr. Seybold, the relevant details of which are discussed below, the court accepted Mr. Seybold's guilty plea. On July 16, 1990, the court sentenced Mr. Seybold to eighteen years' imprisonment for the RICO violation.

## II

### ANALYSIS

On appeal, Mr. Seybold contends that he was denied his Sixth Amendment right to defend himself because with respect to some matters, the court insisted upon dealing with standby counsel rather than with Mr. Seybold. Alternatively, Mr. Seybold argues that his guilty plea was not knowing and voluntary because standby counsel restricted the flow of discovery to him and hampered his ability to make an intelligent decision whether to proceed to trial. Mr. Seybold also invites our attention to the fact that the district court conducted status hearings with the government and standby counsel in his absence. The government submits that Mr. Seybold waived any objection to his right to self-representation when he pleaded guilty, and that his guilty plea was both knowing and voluntary.

### A. *The Effect of the Guilty Plea on the Sixth Amendment Claim*

In a 1970 trilogy of cases, the Supreme Court set forth the general rule that a knowing and voluntary guilty plea bars the defendant from subsequently challenging alleged constitutional deprivations that occurred prior to the plea. *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *McMann v. Richardson*, 397 U.S. 759 (1970); *Parker v. North Carolina*, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970). The Court best stated the principle behind this rule in *Tollett v. Henderson*, 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973):

[A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann*.

*Tollett*, 411 U.S. at 267, 93 S.Ct. at 1608. More recently, the Court acknowledged the vitality of the principle set forth by the *Brady* trilogy: "[W]hen the judgment of conviction upon a guilty plea has become final and the offender seeks to reopen the proceeding, the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary." *United States v. Broce*, 488 U.S. 563, 569, 109 S.Ct. 757, 762, 102 L.Ed.2d 927 (1989); *see Borre v. United States*, 940 F.2d 215, 217 (7th Cir.1991) (" 'Once a plea of guilty has been entered, non-jurisdictional challenges to the constitutionality of the conviction are waived and only the knowing and voluntary nature of the plea may be attacked.' " (quoting *United States v. Brown*, 870 F.2d 1354, 1358 (7th Cir.1989))).

The Court has recognized a narrow exception to the *Brady* rule where a court has no power to enter the conviction. *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974). In *Blackledge*, Mr. Perry, who had been convicted by a state court sitting without a jury, pursuant to state procedural law, asserted his right to de novo review of the conviction. In response, the state's attorney indicted him on a felony count for the same offense. Mr. Perry pleaded guilty to the felony, but later attempted to challenge that plea on the ground that the felony charge itself violated his right to due process of law. The Court held that the general rule of the *Brady* trilogy did not apply:

Unlike the defendant in *Tollett*, Perry is not complaining of "antecedent constitutional violations" or of a "deprivation of constitutional rights that occurred prior to the entry of the guilty plea." Rather, the right that he asserts and that we today accept is the right not to be haled into court at all upon the felony charge.

*Blackledge*, 417 U.S. at 30, 94 S.Ct. at 2104 (citations omitted). *See also Menna v. New York*, 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975) (per curiam) (defendant allowed to raise double jeopardy challenges to guilty plea to offense for which he had been previously convicted and had served a jail sentence); *Broce*, 488 U.S. at 569, 109 S.Ct. at 762 ("There are exceptions where on the face of the record the court had no power to enter the conviction or impose the sentence.").

Mr. Seybold's challenge is not directed at the power of the United States to prosecute him for the RICO charge to which he pleaded guilty but, rather, at his ability to represent himself properly before the court. As such, Mr. Seybold's case falls outside the narrow *Blackledge–Menna* exception and is governed by the *Brady* rule. Therefore, Mr. Seybold's Sixth Amendment challenge was waived by his guilty plea, except to the extent that it is a challenge to the knowing and voluntary character of his plea.[3]

---

3. Mr. Seybold argues that a guilty plea does not imply a waiver of the right to counsel, which must be expressly waived. *See Carnley v. Cochran*, 369 U.S. 506, 514–16, 82 S.Ct. 884, 889–90, 8 L.Ed.2d 70 (1962). Because the right to self-representation is a correlative of that right, Mr. Seybold argues that it, too, must be expressly waived at the time the guilty plea is tendered to the court. Mr. Seybold cites no authority to support this proposition. Moreover, it is clear that Mr. Seybold expressly waived this right at the change-of-plea hearing:

COURT: Now, there is one point that I want to return to. Along the way, you have discussed your right of self-representation in this case, and ... you have cited to me the *Faretta* case or other cases, and once again, I want to tell you this: If this case proceeded to trial, at the trial you would have the right to represent yourself or to be represented by counsel, and this is a quote from the *Faretta* case, and it is contained within the Court's order of April 12, and the case has been cited in other pleadings:

### B. *The Validity of the Guilty Plea*

#### 1. Relevant standards

A guilty plea is invalid unless the record reveals that the defendant entered the plea knowingly and voluntarily. *Boykin v. Alabama*, 395 U.S. 238, 242–44, 89 S.Ct. 1709, 1711–13, 23 L.Ed.2d 274 (1969). To ensure that a guilty plea is knowing, Federal Rule of Criminal Procedure 11(c) requires that a federal district court "inform the defendant of, and determine that the defendant understands" the nature of the charge to which the plea is offered, the possible sentencing range, and the fact that, by pleading guilty, the defendant is waiving a panoply of constitutional rights.

To ensure that a guilty plea is voluntary, Federal Rule of Criminal Procedure 11(d) requires that a federal district court ask the defendant specific questions to determine that the plea is "voluntary and not the result of force or threats or of promises apart from a plea agreement." A Rule 11 proceeding provides the court with an important tool to gauge the defendant's voluntariness and understanding:

Rule 11's provisions specifically seek to ensure that entry of a plea is not a meaningless act. Great care is taken when accepting pleas under Rule 11. Plea agreements are placed on the record, the voluntariness and accuracy of

"The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make a defense.... The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." [*Faretta v. California*, 422 U.S. 806, 819–20, 95 S.Ct. 2525, 2533–34, 45 L.Ed.2d 562 (1975).]

Now, you are aware of the *Faretta* case, are you not?

SEYBOLD: Yes, sir.

COURT: And are you aware of that quote?

SEYBOLD: Yes, sir.

COURT: So you understand that by pleading guilty today that you will be giving up the right at a trial to represent yourself or to be represented by a court-appointed counsel, and, also, to have available to you at a trial so-called standby counsel?

SEYBOLD: Yes, sir.

Tr. Apr. 17, 1990 at 35–36. *See also id.* at 15. Mr. Seybold also expressly stated that his plea was unconditional. *Id.* at 16.

the plea is ascertained, and detailed advice is provided to the defendant concerning his rights and the consequences of his plea as well as a determination that [the] defendant understands these matters.

*United States v. Ellison*, 798 F.2d 1102, 1106 (7th Cir.1986), *cert. denied*, 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987). "The only rational manner in which a judge may determine whether a plea is knowingly and voluntarily made, is to observe the defendant's demeanor and responses to the court's questions and to rely on the defendant's sworn answers." *United States v. Ellison*, 835 F.2d 687, 693 (7th Cir.1987) (appeal after remand). The record of a Rule 11 proceeding is "entitled to a presumption of verity." *Key v. United States*, 806 F.2d 133, 136 (7th Cir.1986). "To deter abuses in the withdrawal of guilty pleas under Rule 32(d), and to protect the integrity of the judicial process, we have held that 'rational conduct requires that voluntary responses made by a defendant under oath [when entering a guilty plea] ... be binding.'" *United States v. McFarland*, 839 F.2d 1239, 1242 (7th Cir.) (quoting *Ellison*, 835 F.2d at 693), *cert. denied*, 486 U.S. 1014, 108 S.Ct. 1750, 100 L.Ed.2d 212 (1988); *see also United States v. Caban*, 962 F.2d 646, 649–50 (7th Cir. 1992) (discussing authorities).

2. Applied to this case

Mr. Seybold does not contest that the trial court conducted the Rule 11 proceeding properly. Thus, in reviewing whether Mr. Seybold's plea was knowing and voluntary, we rely principally upon the transcript of the change-of-plea hearing, supplemented by other portions of the record. Mr. Seybold suggests that his inability to review all of the discovery materials left him, on the eve of trial, "without knowledge of how strong the government's case against him would be." Additionally, he claims that he was "the subject of considerable pressure by" standby counsel to enter a change of plea.

■ At a status hearing on March 29, 1990, Mr. Seybold acknowledged that he had access to forty of the tapes, but he complained that the remainder had not yet been made available to him. On April 12, 1990, Mr. Seybold filed a motion requesting that the trial be continued because neither a complete set of tapes nor transcripts had been delivered to the MCC until April 8. Mr. Seybold also suggests that his standby counsel delayed in delivering to him pleadings from the government. Mr. Seybold now submits that, "[w]ithout access to those materials, [he] was unable to make an informed decision concerning the benefits of pleading guilty as opposed to those of going to trial—the single most important tactical choice a defendant must make." Appellant's Br. at 13. We cannot accept Mr. Seybold's contention that he did not enter knowingly his plea. *Boykin* and its progeny do not require the defendant to know the full extent of the government's case against him before pleading guilty.[4] Instead, "knowledge," as used in this context, refers to "a full understanding of the charges against [the defendant] and the possible consequences of his plea." *Brady*, 397 U.S. at 749 n. 6, 90 S.Ct. at 1469 n. 6. For this reason, Federal Rule of Criminal Procedure 11(c) does not require the trial judge at the plea hearing to air all of the government's evidence against the defendant. Instead, the defendant must be informed of the nature of the charge to which the plea is offered, the possible sentencing range, and the fundamental rights (such as the right to trial, the right to confront and cross-examine witnesses, etc.) that the defendant waives by pleading guilty. *See McCarthy v. United States*, 394 U.S. 459, 464–67, 89 S.Ct. 1166, 1169–71, 22 L.Ed.2d 418 (1969) (discussing Rule 11 and the "knowing" component of guilty plea).

■ Nor can we accept the contention that the plea was less than voluntary. At the change-of-plea hearing, Mr. Seybold assured the court that he was no longer

---

**4.** Mr. Seybold does not suggest that the tapes he was unable to listen to contained any exculpatory evidence.

concerned about his prior protestations over the pace of discovery and that his decision to plead guilty was completely voluntary. Mr. Seybold had filed several motions protesting the delay in delivering the tapes to the MCC. At the hearing, he stated that he understood that the motions would "become moot" upon entry of the guilty plea.[5] Moreover, when asked whether the plea was voluntary, Mr. Seybold answered affirmatively in the strongest terms.[6] Mr. Seybold told the court, on his own initiative, that his plea stemmed from his own desire to admit guilt.[7] "[T]he de-

5. COURT: Now, one of the things that you have brought to my attention is that you have the right, if you decide to proceed on that basis, at the trial to represent yourself, and you understand that by pleading guilty today, you are giving up the right to proceed to trial, at which you could represent yourself....

SEYBOLD: Yes, sir, I understand that. And I also understand that my—my pleading and going with this plea agreement, any of the motions that I put in become moot at this point, and the guilty plea infers that I am willing to accept the sentence that your honor may pass—

COURT: Have you discussed that also with [standby counsel]?

SEYBOLD: Yes, sir.

COURT: Now, with respect to those motions, I am not going to count them all, now, but I have copies of them, because you sent them to me along the way.

SEYBOLD: Yes, sir.

COURT: And you have filed how many pretrial motions that you are aware of?

SEYBOLD: Well, I'd—I'd say about 33, sir.

COURT: And as you have just said, you understand that by pleading guilty, now, the issues that you have raised or attempted to raise in those motions would become moot.

SEYBOLD: Yes, sir, I understand that.

COURT: And you have also discussed that with [standby counsel]?

SEYBOLD: Yes, I have, your Honor.

COURT: Now, that would include all of the motions that you have made.

SEYBOLD: Yes, sir.

Tr. Apr. 17, 1990 at 15–16.

6. COURT: Are you entering into this written plea-bargain agreement voluntarily?

SEYBOLD: Yes, sir.

COURT: Are you being coerced or forced into it in any way?

SEYBOLD: No, I'm not, sir.

COURT: Is this your free and voluntary act?

SEYBOLD: Yes, sir.

Id. at 6.

COURT: ... [T]oday, we're going to deal strictly with the issue of whether there is a voluntary, intelligent plea of guilty in this case.

SEYBOLD: Yes, sir. Well, let me stress that, definitely, there is, sir. I've discussed this—I've thought about it quite a bit in the last two weeks. I've discussed it with several people, and that's the reason I wanted to speak with [the Assistant United States Attorney], which I did today for about an hour. I also spoke to [another Assistant United States Attorney] for about five minutes a little while ago.

COURT: Did you speak with [the Assistant United States Attorney] voluntarily?

SEYBOLD: Yes, I did, sir.

COURT: And with respect to [both Assistant United States Attorneys], who are here in open Court, did you initiate the conversation?

SEYBOLD: Yes, I did, your Honor.

Id. at 7–8.

COURT: Now, have you entered into this plea-bargain agreement voluntarily?

SEYBOLD: Absolutely.

Id. at 12.

COURT: Now, you have brought to my attention many, many facts that—some of which are related to this incident, and some are unrelated.

SEYBOLD: Yes.

COURT: But, is this your free and voluntary act to enter into this plea-bargain agreement?

SEYBOLD: It is, absolutely, sir.

Id. at 38.

COURT: Now, Mr. Seybold, before we started this hearing, you knew then, as you know now, that you have an absolute right to remain silent, is that correct?

SEYBOLD: Yes, sir.

COURT: Did you decide to make these statements voluntarily?

SEYBOLD: I certainly did, sir.

COURT: Have you been coerced or threatened in any way to making these statements?

SEYBOLD: No, I haven't, sir.

COURT: Are you being pressured?

SEYBOLD: No, sir.

COURT: Are you being coerced or in any way influenced into saying what you are saying?

SEYBOLD: No, sir.

Id. at 44–45.

7. COURT: Now, this plea is a total, complete, full, and absolute plea of guilty, is that correct?

SEYBOLD: That's correct, your Honor.

COURT: Is this plea, as far as you are concerned, conditioned on anything, except for the terms of the plea-bargain agreement itself in writing?

SEYBOLD: No, let me say this, your Honor, it's conditioned on the fact I've more or less—more than less found the truth in my own heart, and I wanted to own up to it, and this was the opportunity to do so.

fendant's declaration in open court that his plea is not the product of threats or coercion carries a strong presumption of veracity...." *United States v. Darling,* 766 F.2d 1095, 1101 (7th Cir.), *cert. denied,* 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 561 (1985). The district court was on solid ground in concluding that, despite any delay in access to discovery materials or any alleged pressure from standby counsel, Mr. Seybold both knowingly and voluntarily pleaded guilty.[8]

## CONCLUSION

For the foregoing reasons, the district court's judgment of conviction is affirmed.

AFFIRMED.

*Id.* at 16.

SEYBOLD: ... I mentioned the circumstances that you didn't know because I thought you should know them, and as an afterthought, I think you know that—you know and the U.S. Attorney's office also knows that most of the time I was trying to protect Mrs. Dell....

....

COURT: Is your plea this afternoon in any way conditioned on your relationship with Ruth Dell?

SEYBOLD: No, its—its predicated entirely on the fact that, even at this age, I woke up awfully late, and it's just right that I get it out of my system and out of my mind, and whatever time I have left, I want to spend it decently.

*Id.* at 42–43.

8. While unnecessary to our decision, we note Mr. Seybold's familiarity with the criminal process and with pleading guilty in particular. *See Seybold v. United States,* 904 F.2d 39 (7th Cir. 1990) (table notation of unpublished opinion; text available at 1990 WL 75360, 1990 U.S.App.LEXIS 8852) (collateral challenge to 1987 guilty plea); *Seybold v. Cady,* 431 F.2d 683, 684 (7th Cir.1970) (collateral challenge to 1964 guilty plea); Tr. of Sentencing Hearing, July 16, 1990, at 55–56.