**In re Honorable Albert E. DeROBBIO.**

No. 92–131–M.P.

Supreme Court of Rhode Island.

March 12, 1992.

OPINION

PER CURIAM.

This matter comes before us on a petition by Chief Judge Albert E. DeRobbio of the District Court seeking that we review and adopt a report submitted by the Commission on Judicial Tenure and Discipline (Commission) concerning alleged ethical violations that might have arisen in the performance of his prosecutorial function in the case of *State v. Ralph Byrnes et al.;* tried in the Superior Court during the year 1976. This case was better known as the "Bonded Vault Robbery" case. We have examined the report of the Commission which found that Chief Judge DeRobbio committed no violations of the canons of ethics nor caused his office serious disrepute by any of his actions as the prosecutor in the bonded vault robbery trial. We have further examined the record upon which these findings have been based and agree that the findings of the Commission are overwhelmingly supported by the direct and credible evidence. We append the report of the Commission to this opinion, marked as appendix A and adopt its findings and rationale. The inquiry in respect to possible ethical violations arose out of the following circumstances.

On August 14, 1975, the bonded vault robbery took place in the City of Providence. As stated in the opinion of the Court of Appeals for the First Circuit, nine masked men entered the commercial safe-deposit company, robbed its employees at gunpoint, then broke into 146 safe-deposit boxes. It was believed that the robbery produced approximately four million dollars in cash and other valuables. The case was tried during the summer of 1976, and John F. Ouimette (Ouimette) was convicted of one count of conspiracy and one count of aiding and abetting the robbers. In fact the evidence indicated that Ouimette had planned and masterminded the enterprise though he was not present at the scene of the crime. He was sentenced to life imprisonment. One of the principal witnesses at trial was Robert J. Dussault, who testified that he had been a career criminal for twenty years. Ouimette and his co-defendants, Ralph Byrnes and Charles Flynn, appealed to this court. Their appeal was denied in *State v. Byrnes,* 433 A.2d 658 (R.I.1981). In support of their appeal the defendants raised eight issues. None of these issues included any complaint that the criminal record of Dussault or his plea

agreement with the state had in any way been concealed from them.

However, in 1982 Ouimette sought a reduction of his life sentence pursuant to Rule 35 of the Superior Court Rules of Criminal Procedure. The motion for reduction was heard before a panel of three judges of the Superior Court. In the course of this hearing, Ouimette admitted his guilt in respect to the robbery under oath in the following terms:

"I—I'm going to be a little nervous, you'll have to excuse me, but as far as the robbery, I am guilty of the robbery. As far as the money part, that's not true. There was no millions of dollars. I don't have no money when I get out to go away, whatever people think. The truth of the matter is, there was no million dollars taken to my knowledge, and that is the truth. Uh, I mean, it's been built up over the past years. Now it's up to four million. The first time it was two, three, now it's up to four, and that is just not the truth.

"I'm sorry about what happened in the robbery. I'm sorry both to the boxholders and especially to the employees in the place.

"And I have changed. I think jail was the right thing for me at the time. I think I learned a lot from being there. I had a lot of time to think, and I got to know myself a little better—a little bit better, I should say."

Thereafter, John A. Murphy, Esquire, who had assumed the prosecutorial duties in the case after the appointment of Judge DeRobbio to the District Court, asked the following questions and received the following answers.

"Mr. Murphy: Do you make this admission of guilt freely and of your own volition here today?

"Mr. Ouimette: Yes.

"Mr. Murphy: And you make it knowingly? You feel okay today?

"Mr. Ouimette: I feel very good. Not about the robbery. I feel bad about that.

That was the worst thing that ever happened in my life. It was bad, and I, surely, I did get off on the wrong road somehow, but now I know I'm on the right track and I'm starting to get a little education and I feel—I feel good about that. Not the robbery; that was bad."

After the completion of the hearing Ouimette's sentence was reduced from life imprisonment to forty-five years imprisonment with fifteen years suspended.

Such a solemn judicial admission of guilt would normally preclude the raising of any issues, constitutional or otherwise, that might be asserted in respect to the validity of his conviction. *See e.g., United States v. Broce,* 488 U.S. 563, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989) (precludes raising issue of double jeopardy); *Tollett v. Henderson,* 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973) (waives relief regarding composition of grand jury); *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (precludes collateral relief in respect to a coerced confession); *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (relief precluded even if admission of guilt motivated by a desire to avoid death penalty or to obtain a lesser sentence).

Nevertheless Ouimette sought post-conviction relief in the Superior Court based on prosecutorial misconduct in failing to disclose to Ouimette during the course of the trial the complete criminal record of Robert J. Dussault. This claim was denied by a justice of the Superior Court on the state's motion for summary judgment. This court affirmed the summary judgment, noting that the prosecutor Albert DeRobbio had not failed to comply with Rule 26.1(d) of the Superior Court Rules of Criminal Procedure in that he had turned over to counsel for Ouimette a "rap sheet"[1] that listed four convictions, two of which were misdemeanors. DeRobbio stated in open court that this "rap sheet" was the only record he had but admonished counsel for the defendant that it might not

---

1. The "rap sheet" was a criminal record obtained by the prosecutor from the Federal Bureau of Investigation.

be complete. Prosecutor DeRobbio made the following statement:

" 'May I indicate, that the docket I gave [defendant's counsel] is—the best of my knowledge, may be complete, but it does not indicate on that docket as to whether he was robbing a bank or how many banks he robbed during that period of time, or maybe it's a complete report. It was only given to [defendant's counsel] as to information that was within a file that was available to us. That report may not have been complete. But I'm not responsible for completeness of record.' " *Ouimette v. Moran*, 541 A.2d 855, 857 (R.I.1988).

This court held that although it later became known that Dussault had a number of other convictions in the Commonwealth of Massachusetts, prosecuting attorney DeRobbio had fulfilled his obligation under Rule 26.1(d).[2] It should be noted that Ouimette did not seek discovery from the state under Rule 16 of the Superior Court Rules of Criminal Procedure and, therefore, was not entitled to discovery from the state save what might be in the possession of the prosecutor pursuant to Rule 26.1(d). In our opinion the prosecutor was not obliged to search out additional records of conviction beyond those he might have had in his file. This is particularly true in light of the fact that Dussault and Ouimette were well acquainted with each other, Dussault was also known to counsel for defendant.

Subsequent to the denial of his state application for post-conviction relief, Ouimette sought habeas corpus relief in the Federal District Court pursuant to 28 U.S.C. § 2254. An evidentiary hearing as well as discovery was ordered by a federal magistrate-judge. This magistrate-judge made a series of factual findings, all of which were incorporated into the judgment of the Federal District Court[3] and adopted by the Court of Appeals for the First Circuit. Among these findings were numbers 13 and 14, which read as follows:

*"Finding No. 13:* The Court finds that after the request by petitioner's counsel for a complete record of criminal convictions of Robert Dussault, made at a bench conference during the Bonded Vault trial, the prosecutor failed to provide such a complete record. Further, the Court finds the prosecutor could have readily produced a record of some twenty-eight criminal convictions of Dussault, all of which occurred prior to the trial of petitioner.

*"Finding No. 14:* The Court finds the exhibits and testimony in this proceeding establish that records of Dussault's prior criminal convictions had been obtained by two major Rhode Island law enforcement agencies * * * and that those records were readily available to the prosecutor for the asking at the time of trial. Upon examination of the evidence adduced at hearing, I find that the prosecutor had in his possession some twenty-one felony and seven misdemeanor convictions of Robert Dussault before he began the prosecution of petitioner Ouimette on the Bonded Vault trial."

■ As a result of these findings and their adoption by the United States Court of Appeals for the First Circuit, the Chief Justice of this court asked the Commission to hold an evidentiary hearing to determine the truth of the findings from the point of view of ethical violation. It is not the function of this court to review the factual findings of the Federal District Court or its magistrate-judge. It is not our function to review the legal determinations of the Court of Appeals of the First Circuit. Nevertheless, when an opinion of either

---

**2.** The Rhode Island discovery rule is extremely liberal, but it provides for mutual discovery. Under Rule 16(b) of the Superior Court Rules of Criminal Procedure, defendant who seeks any discovery under subdivision (a) of the rule must provide extensive discovery to the state upon request. Therefore, a decision on the part of a defendant not to seek discovery is an important strategic decision. The fact that co-defendants may have sought discovery is irrelevant under our rule to the obligation of the state in respect to a defendant who has chosen not to seek discovery.

**3.** In this case the federal magistrate-judge was exercising the full authority of the District Court by agreement of the parties pursuant to 28 U.S.C.A. § 636(c) (West Supp.1991).

court impugns the integrity of a member of the Rhode Island judiciary, it is both our prerogative and our responsibility to investigate the allegations underlying the accusation of ethical misconduct in the discharge of our role as the disciplinary authority with jurisdiction over members of the Rhode Island Bar and Judiciary.

■ In the discharge of this obligation we have reviewed the record of testimony elicited before the federal magistrate-judge as well as the sworn testimony received by the hearing subcommittee of the Commission. A careful review of both records discloses not one shred of direct evidence that prosecutor DeRobbio deliberately withheld information known to him concerning the criminal record of Dussault. He relied upon a record obtained from the Federal Bureau of Investigation and admonished counsel that it might not be complete. Evidence was elicited before the magistrate-judge from various police officers that additional knowledge of a criminal record may have been available to them. There was no evidence that they turned this information over to prosecutor DeRobbio save an inference based upon past practice. The magistrate-judge expressed some skepticism about the failure of memory of the police officers. In our opinion diminution of memory after fifteen years is not remarkable.

We believe, as did defense counsel, that prosecutor DeRobbio would have had no motivation to fail to disclose additional convictions on the part of a witness who had been presented candidly as a career criminal. The incremental effect of these additional convictions would have been minimal. In our opinion the magistrate-judge piled inference upon inference to find a deliberate violation on the part of a prosecutor who was doing his best to discharge his obligation in a lengthy and complex trial. He focused upon an admittedly incomplete record, a minor element in a complex trial, and expanded it into a deliberate constitutional violation, as well as a breach of the principles of the Magna Charta (whose framers in 1215 never even vaguely imag-

ined discovery in criminal cases, or the limited obligations under Rule 26.1(d)).

We are persuaded by the uncontradicted evidence elicited by the hearing subcommittee of the Commission together with the direct evidence elicited before the federal magistrate-judge that prosecutor DeRobbio committed no ethical violation.

For the reasons stated, we accept the report of the Commission on Judicial Tenure and Discipline and find that no ethical violations were committed by prosecutor DeRobbio in respect to the Dussault criminal record or in respect to the tape-recorded agreement reached between the prosecution and Dussault.

## APPENDIX A

## STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS COMMISSION ON JUDICIAL TENURE AND DISCIPLINE

In re: Albert E. DeRobbio

### REPORT

December 4, 1991

### CHRONOLOGY

On August 14, 1975, a robbery took place in the City of Providence at the Bonded Vault Company.

On that morning, Robert Dussault, accompanied by several masked gunmen, entered the private vault service located at 101 Cranston Street. The bandits pried open approximately one hundred (100) safe deposit boxes and from them took cash, coins, diamonds, silver, gold and other valuables. The loot was placed in several duffle bags and carted away by the robbers. The estimated value of property taken exceeded two million dollars. The daring daylight robbery was acknowledged by law enforcement officials, (Providence Journal—November 2, 1975) to be the second largest cash robbery in the history of the United States.

The day in question was the thirtieth (30th) anniversary of the end of World War II but also could be remembered as the beginning battle in a legal odyssey which

best could be called the "Saga of the Bonded Vault". The legal war between the defendants and prosecutors has gone on for over fifteen (15) years. Battles have been waged in the Rhode Island Superior Court and Supreme Court, as well as the United States District Court, the First Circuit Court of Appeals, and the United States Supreme Court.

The Superior Court trial, which lasted for ten weeks and resulted in the convictions of several defendants, was the longest jury trial in a criminal case ever held in Rhode Island. The trial attracted intense media coverage, due in large part to the nature of the charges and the fact that armed and uniformed State Police troopers were stationed in the courtroom and throughout the Providence County Courthouse.

The prosecutor for the state was Assistant Attorney General Albert E. DeRobbio, the chief of the Criminal Prosecution Unit, who had served in that position under three Attorneys General. Prosecutor DeRobbio was also assisted by a young attorney, John A. Murphy, who had joined the Department of Attorney General the previous year. The defendants were represented by veteran and experienced criminal defense counsel both from Rhode Island and Massachusetts. John Ouimette was represented by Attorney John F. Cicilline, a prominent criminal defense attorney.

The trial was acrimonious and heated with frequent procedural motions made by defense counsel. During the hot summer months of that Bicentennial year, the trial consumed all of the working hours of the Prosecutor. Compounding the heavy workload, DeRobbio suffered a personal tragedy when his father died during the course of the Bonded Vault trial.

This was a period in our legal history in which it was fashionable as a trial tactic, to attempt to bait the prosecutor or judge to commit error in order to cause a mistrial or new trial on appeal. The most notable example of this tactic was the trial of the "Chicago 8" held in the United States District Court in Illinois.

During the Bonded Vault proceedings in the Superior Court, frequent personal and derogatory remarks were directed at the prosecution team by the defendants. In fact, a review of the 6,000 page transcript discloses that the defendants, during the trial, filed several motions seeking a mistrial on the grounds of prosecutorial misconduct.

In August of 1976, almost a year-to-date of the actual crime, the Jury returned a verdict finding that the robbery was masterminded and planned by John Ouimette. The trial justice sentenced Ouimette to a term of life imprisonment.

Upon appeal to the Rhode Island Supreme Court, defendant Ouimette engaged the services of not only Attorney Cicilline but also Attorney William M. Kunstler. Mr. Kunstler had gained national notoriety for his participation in various and highly publicized trials, most notable of which was the "Chicago 8" trial.

In December 1976, four months after the trial concluded, Prosecutor DeRobbio was appointed an Associate Judge of the Rhode Island District Court. Special Assistant Attorney General John A. Murphy then assumed responsibility for the case.

Defendant Ouimette, nevertheless, was not successful in his appeal (*State v. Byrnes*, 433 A.2d 658) and the verdict and sentence by the trial justice was upheld.

Thereafter, the defendant filed a motion under the provisions of Rule 35 of the Superior Court Rules of Criminal Procedure to reduce his sentence. Defendant Ouimette was successful in this quest when a three-judge panel reduced his sentence from life to 45 years with 15 years suspended.

It is very significant to note that during the course of these proceedings, defendant Ouimette, under oath, admitted that he took part in the robbery and shared in the proceeds.

Still, not satisfied with the sentence reduction, defendant Ouimette filed in the Superior Court a motion for post conviction relief. As a basis of his motion, defendant Ouimette alleged prosecutorial misconduct

by Prosecutor DeRobbio and judicial misconduct by a member of the three-judge panel.

The trial justice in Superior Court saw no merit in the petition and granted the state's motion to dismiss. The defendant once again appealed to the Rhode Island Supreme Court and the action of the Superior Court was upheld (*Ouimette v. Moran,* 541 A.2d 855).

After the denial of his request for relief by the Supreme Court, the defendant then moved to the Federal District Court where he filed a Writ of Habeas Corpus based upon the same allegations of prosecutorial misconduct that were raised in the state court system. On December 28, 1988, the state and the defendant consented to have the matter heard by a Magistrate–Judge in lieu of a hearing by the United States District Court Judge.

The Magistrate–Judge granted defendant Ouimette's motion to obtain discovery from the State including taking the deposition of Chief Judge Albert E. DeRobbio (former Prosecutor DeRobbio). The granting of discovery in Habeas Corpus proceedings is somewhat uncommon. Moreover, after discovery was obtained, affidavits and briefs filed, the Magistrate–Judge *sua sponte* (at the request of neither party), ordered that an evidentiary hearing be held. As a result, various police officers who were members of the prosecution team that assisted the Prosecutor DeRobbio, were called to testify in the Federal Court. The witnesses were examined by both counsel as well as the Magistrate–Judge who took an active role in questioning certain witnesses.

As a result of the hearing, the Magistrate–Judge made fourteen (14) findings of fact contained in a strongly worded thirty (30) page decision. The decision is highly critical of the prosecution of defendant Ouimette and concludes that Ouimette was denied a fair trial. In his decision, the Magistrate–Judge ordered that Ouimette be unconditionally released from the custody of the State of Rhode Island.

Unconditional release is a highly unusual remedy, especially considering that the defendant in post-conviction relief proceedings, admitted his guilt.

Furthermore, the exact allegations of prosecutorial misconduct raised before the Federal Court were heard and denied by the Rhode Island Superior and Supreme Courts (*Ouimette v. Moran,* 541 A.2d 855).

In August of 1991, the Chief Justice of the Supreme Court requested that the Commission on Judicial Tenure and Discipline conduct an inquiry into the alleged prosecutorial misconduct since the former prosecutor was now the Chief Judge of the Rhode Island District Court.

At its September meeting, the Commission voted to conduct a preliminary investigation into the matter. A subcommittee was appointed in accordance with the provisions of § 8–16–4 of the General Laws. The Commission Chair appointed Associate Justice Raymond E. Shawcross of the Rhode Island Family Court to serve as Chairperson of the subcommittee and Speaker of the House of Representatives Joseph DeAngelis and Senator David Kerins as members.

Chief Judge DeRobbio was not a party to the proceedings in the Federal Court. He was not called as a witness and had no opportunity to call or question witnesses on his own behalf. Therefore, the subcommittee determined it appropriate that in fairness to Chief Judge DeRobbio and due to the seriousness of the allegations that the entire issue should be thoroughly reviewed and not limited to the findings of the Magistrate–Judge.

The subcommittee, upon being appointed, met and began the arduous task of compiling and reviewing all of the relevant documentary evidence. Pertinent portions of the 6,000 page transcript of the trial were obtained and reviewed. Moreover, the subcommittee read the briefs of both parties submitted to the United States Federal District Court and the First Circuit Court of Appeals. The entire transcript of the proceedings before the Magistrate–Judge was carefully analyzed. The decisions of the various courts which heard the matter

were read and analyzed. In addition, the subcommittee has reviewed the Petition for Writ of Certiorari presented to the United States Supreme Court in November of 1991, by the Attorney General.

Once all of the documentary evidence was considered, the subcommittee began the process of interviewing individuals who were not presented as witnesses in the proceedings in the Federal District Court.

The following individuals were interviewed under oath:

1. *Chief Judge Albert E. DeRobbio*
 —District Court of Rhode Island
2. *Attorney John Austin Murphy*
 —Former assistant to Prosecutor
 —Represented State in appellate proceeding
3. *Attorney John F. Cicilline*
 —Trial Counsel for Defendant Ouimette in 1976
4. *Deputy Attorney General Walter Gorman*
 —Represented Rhode Island in the Federal Court proceedings
5. *Special Assistant Attorney General Caroline C. Cornwell*
 —Represented Rhode Island in the Federal Court proceedings

All subcommittee interviews were conducted in the presence of a certified court stenographer. A complete transcript of all of the interviews has been placed in the file of the Commission on Judicial Tenure and Discipline.

## ISSUE

*Does the alleged conduct of The Honorable Albert E. DeRobbio, and his handling of the prosecution of the Bonded Vault Trial in 1976 violate any provisions of the Canons of Judicial Ethics or does said alleged conduct bring his judicial office into serious disrepute?*

## FINDINGS AND CONCLUSIONS

The specific allegation of prosecutorial misconduct that has been levied against Judge DeRobbio is that he withheld the complete record of previous criminal convictions of the state's star witness, Robert Dussault from defense counsel. Dussault, the lead robber of the gang who entered the Bonded Vault premises, was a career criminal; well-known in both law enforcement and underworld circles. He had escaped from a Massachusetts prison only one month prior to the robbery. Within days after the robbery, he was identified as one of the gunmen based upon information developed by the Rhode Island State Police. By October 1975 he was indicted by a Grand Jury and a nationwide alert was issued for his arrest.

Of some interest is that just prior to the robbery, Dussault contacted defendant Ouimette's trial attorney inquiring of the whereabouts of Ouimette. This apparently occurred while unknown to the attorney, Dussault was an escapee. Moreover, the same attorney visited Dussault in a Massachusetts prison previously at Dussault's request when he was seeking legal advice on a petition to reduce his sentence. Therefore, it is reasonable to conclude that defendant Ouimette and his attorney had some familiarity with the notable criminal record of Mr. Dussault.

Moreover, after Dussault's indictment, the Providence Journal published a profile of him on November 2, 1975. The newspaper article quoted Massachusetts officials and other law enforcement sources concerning Dussault's lengthy criminal record and his propensity for large cash robberies.

On January 2, 1976, Dussault was apprehended by Las Vegas, Nevada police. Once arrested, he told the local police that he wished to cooperate with Rhode Island law enforcement authorities by giving information on the Bonded Vault robbery. Informed of the arrest, a contingent of State and Providence Police Officers, along with the Assistant Attorney General Albert E. DeRobbio, arrived in Las Vegas the next day to interview Dussault.

A video taped confession was obtained wherein Dussault gave specific details of the planning and commission of the Bonded Vault robbery. He agreed to testify against his confederates and Assistant At-

torney General DeRobbio, on behalf of the State, entered into an agreement by which Dussault would not serve any prison time for the robbery. Furthermore, Prosecutor DeRobbio agreed to intercede with Massachusetts officials in connection with Dussault's escape. The agreement is set forth in detail on the video tape. A review of the video tape transcript indicates that Assistant Attorney General DeRobbio made no guarantee that Dussault would not have to serve additional time in Massachusetts.

The Federal Magistrate–Judge in his decision found that the video tape was never provided to defendant Ouimette. This finding is contradicted by the Superior Court transcript as well as the recollections of Prosecutor DeRobbio and Attorney Murphy. The trial justice ordered that the entire video tape be made available to the defendant and as a result it was played in its entirety for defense counsel in the courtroom during the course of a luncheon recess.

Before the trial began in the Spring of 1976, another of the robbers, Joseph Danese, in addition to Dussault, agreed to testify as a witness for the State. Dussault testified unequivocally that he was a career criminal. He stated that he led a life of crime for at least twenty (20) years; had served prison time and was an escapee from a Massachusetts prison at the time of the Bonded Vault robbery.

As part of trial strategy, defendant Ouimette filed no request for pre-trial discovery. Therefore, under the provisions of Rule 26.1 of the Superior Court of Criminal Procedure, the state was mandated to provide defendant Ouimette with "a written statement of all criminal convictions of the witness that are known to the attorney for the state or are contained in the files of the Attorney General's Division of Criminal Identification." Prosecutor DeRobbio complied with the rule by giving the defense a copy of the Federal Bureau of Identification (FBI) "rap sheet" listing Dussault's criminal convictions. The rap sheet did not contain the complete list of Dussault's criminal history. The State Bureau of Criminal Identification (BCI), had no record of Dussault since he had never been arrested in Rhode Island.

A more accurate and complete record of Dussault's criminal history was on file with the Massachusetts Department of Public Safety, Bureau of Identification. Other than the Bonded Vault robbery, all of Dussault's arrests occurred in Massachusetts.

On July 26, 1976, during the Superior Court trial, a bench conference took place while Dussault was testifying. At that time, Assistant Attorney General DeRobbio informed the trial justice and defense counsel that the FBI report "may not be complete." The trial justice remarked that he thought that it was unusual that the report listed only four (4) convictions when the witness testified that he had been in and out of jail for twenty (20) years and was a career criminal. Prosecutor DeRobbio stated that he was not responsible for the completeness of the record but only required to give defense counsel the information that he had in his possession. Defendant Ouimette's trial counsel requested that the prosecutor furnish him with the entire record. This colloquy covered about one page of a 6,000 page transcript. It was never mentioned again on the record by either the trial justice, Prosecutor DeRobbio or defense counsel.

It is undisputed that the complete history of criminal convictions was never supplied to defense counsel.

When the issue was raised in the State Courts, as a basis for Defendant Ouimette's post-conviction relief, the Rhode Island Supreme Court ruled that a review of the transcript discloses that Assistant Attorney General DeRobbio "did not misrepresent the completeness or reliability of the witness' record of convictions," (*Ouimette v. Moran,* 541 A.2d 855). In a deposition given on November 18, 1989, as a part of Ouimette's discovery for the Writ of Habeas Corpus proceeding, Chief Judge DeRobbio clearly and unequivocally stated that he gave to the defense counsel the only record of Dussault's convictions that he had in his possession. In his sworn interview before the Commission's Subcom-

mittee, Chief Judge DeRobbio once again, stated emphatically he forwarded to the defense, the only record he had in his possession. He denied withholding any information on Dussault's criminal background, stating that he never had the Massachusetts "rap sheet." He further informed the Subcommittee that throughout his career as a prosecutor, it was his policy to freely exchange whatever information, concerning witnesses, he had in his possession with defense counsel. Chief Judge DeRobbio reiterated his position that Dussault was presented to the Court as a career criminal; a "bad guy," part of a gang of robbers and bandits who committed the second largest cash robbery in history. Chief Judge DeRobbio said that there would be no reason for the State to downplay or whitewash Dussault's criminal convictions.

Attorney John Austin Murphy testified that he had no contact with Chief Judge DeRobbio in several years. He stated that he had great respect for Judge DeRobbio's fairness and integrity. His position as an Assistant to the Prosecutor at the Bonded Vault Trial is where he first became acquainted with Judge DeRobbio. Attorney Murphy found Prosecutor DeRobbio to be a dedicated professional with a tremendous appetite for hard work and long hours. According to Attorney Murphy, Prosecutor DeRobbio worked seven (7) days week during the course of the trial.

Murphy never saw any indication of DeRobbio's withholding of information from defense counsel. He further stated that he never saw the Massachusetts "rap sheet" during the trial nor does he recall it ever being an issue that defense counsel were requesting additional information on Dussault's criminal background.

Murphy presented the subcommittee with a large black binder which he said contained 639 pages of handwritten notes. These notes were taken by Murphy during the trial as part of his duties in assisting the prosecutor. After a review of the notes, it was determined that there was no information contained therein that would be of assistance to the subcommittee. Specifically, no mention is made of the need for further information on Dussault's criminal record.

Attorney John F. Cicilline, in his interview with the Subcommittee, stated that he had known Prosecutor DeRobbio professionally for several years before the Bonded Vault Trial. Among the criminal defense bar, Attorney Cicilline reported that Prosecutor DeRobbio had a reputation as a tenacious prosecutor. However, his tenacity was matched by his integrity and fairness. Attorney Cicilline reported that DeRobbio was the most vigorous and determined prosecutor he ever faced in trial, but also pointed out that he was as fair as he was tough.

While Attorney Cicilline stated that he accepted the conclusion of the Federal Court "that information was withheld from defense counsel at the time of the trial," he does not believe that Prosecutor DeRobbio had any part in withholding said information. Attorney Cicilline speculated that there would be no motivation for the Prosecutor to withhold the information when the information could have been easily obtained and the risk of nondisclosure could lead to the conviction being overturned. In Attorney Cicilline's opinion, it was the police who withheld the information not only from the Defense but from Prosecutor DeRobbio as well.

Deputy Attorney General Gorman and Special Assistant Attorney General Cornwell both testified that they had been involved with the Federal Court proceedings for some time and knew of no direct evidence which indicates that Chief Judge DeRobbio was involved in any prosecutorial misconduct. Deputy Attorney General Gorman stated that quite frankly, he did not believe that Chief Judge DeRobbio was involved in any impropriety in the Bonded Vault trial.

The Subcommittee found that Chief Judge DeRobbio's testimony before the Subcommittee to be credible and convincing. The findings of the Federal Court and as a result the subsequent publicity have obviously caused Chief Judge DeRobbio a

great deal of pain and anguish. The Federal Court decision has besmirched his otherwise unblemished record as a Prosecutor.

However, in our judgment, there is not a shred of direct evidence that Chief Judge DeRobbio was aware of or withheld the complete criminal history. On the contrary, it is apparent that he disclosed to defense counsel in open Court that there may be a problem with the FBI "rap sheet" on Dussault. He never misrepresented the criminal record but rather stated that the FBI "rap sheet" was the only record in his possession.

The findings of the Federal Court are inconsistent with Chief Judge DeRobbio's reputation and character. The witnesses interviewed by the Subcommittee, who did not testify in the Federal Court proceedings, are supportive of Chief Judge DeRobbio's position. While there may be circumstantial evidence that may lead to the conclusion that the prosecution team could have been more diligent in providing the complete record; considering the entire circumstances of the trial, it is unfair and unjust to conclude that this indicates any ethical violation by Judge DeRobbio.

The Subcommittee based upon a complete and thorough inquiry into the matter is unable to find that Prosecutor DeRobbio was personally involved in or sanctioned any prosecutorial misconduct in the Bonded Vault trial. Chief Judge Albert E. DeRobbio has served as a member of the Judiciary for fifteen (15) years with significant and substantial responsibilities. He has been a productive, conscientious and energetic Judge.

This Subcommittee finds no evidence that Chief Judge DeRobbio has violated any provisions of the Canons of Judicial Ethics or caused his office serious disrepute by any of his actions as the Prosecutor in the Bonded Vault trial.

We therefore, recommend that the inquiry be closed and that both the Chief Justice of the Supreme Court and The Honorable Albert E. DeRobbio be informed of this action and copies of this decision be forwarded to them forthwith.