UNITED STATES of America, Plaintiff,

v.

Johnnie Louis McALPINE, a/k/a
Louis McAlpine, Defendant.

Crim. A. No. 93–10009–01.

United States District Court,
D. Kansas.

Aug. 23, 1993.

Lanny Welch, Asst. U.S. Atty., Wichita, KS, for plaintiff.

Ed Dosh, Parsons, KS, for defendant.

## MEMORANDUM AND ORDER

BELOT, District Judge.

Defendant entered pleas of guilty to Counts 2, 4, 5, 6, 9, 15, 22 and 23 of an

indictment charging violations of 18 U.S.C. § 1341 and 2. Pursuant to a plea agreement, the government agreed to recommend a two-level reduction for acceptance of responsibility pursuant to section 3E1.1 of the sentencing guidelines and further to recommend a sentence at the low end of the guideline range. The parties did not agree on the amount of loss to be used under section 2F1.1(b)(1) of the guidelines to increase the offense level nor have they have agreed to the amount of restitution the defendant should be ordered to pay.

In the presentence report, the probation officer determined the base offense level to be 6. He increased the base offense level by 11 points based upon a total loss from the defendant's fraud scheme of a little over 7 million dollars.[1] The probation officer added 2 points for more than minimal planning, U.S.S.G. § 2F1.1(b)(2)(A) and deducted 2 levels for acceptance of responsibility, U.S.S.G. § 3E1.1(a). The total offense level was determined to be 17. The defendant's criminal history established a criminal history category of III.[2]

Defendant's very able counsel filed 12 objections to the presentence report along with a detailed written version of the offense signed, but not sworn to, by defendant. Because defendant disputed the amount of loss,[3] the court held an evidentiary hearing. Both sides called witnesses but defendant did not testify. Following the hearing, the parties submitted written memoranda regarding the amounts of loss and restitution (Docs. 52 and 56).

The purpose of this memorandum is to resolve defendant's objections in accordance with Rule 32(c)(3)(D), Fed.R.Crim.P., which provides:

If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or parts thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A written record of such findings and determination shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons.

Each objection will be discussed but the objections will be grouped by subject matter rather than taken seriatim. In addition, the court will explain its reasons for failing to follow the terms of the plea agreement. Finally, the court will resolve the issue of restitution.

### Objections to offense Conduct Objections Numbers 1 and 2

■ Defendant objects to certain portions of the probation officer's version of the offense conduct concerning defendant's representations to James Draper regarding the nature of Miura Petroleum's interest in the "Leach Field" and Draper's involvement as the "middle man" in some of the transactions with investors. (PSI, paras. 10 and 11)

Paragraphs 1 through 26 of the indictment set forth general allegations regarding the defendant's scheme to defraud (paragraph 9 relates specifically to the "Leach Field") and each of these paragraphs is incorporated by reference in the specific counts of the indictment. By entering pleas of guilty to certain

---

1. The probation officer's finding was as follows: The total offense involved $7,042,199.53 when the overall scheme is considered. The amount of loss sustained in the counts to be dismissed must be considered as it is relevant conduct. U.S.S.G. § 1B1.3(a)1 sets out that all acts and admissions that are aided and abetted by the defendant, or for which the defendant would otherwise be accountable, that occurred during the commission of the offense of conviction, in preparation for the offense, or in the course of attempting to avoid detection or responsibility for that offense or that otherwise

were in the furtherance of the offense, should be used to determine the applicable guideline range. As a result, the defendant's offense computation must be increased by eleven levels.

2. The 1987 edition of the guidelines was used.

3. Defendant contended that the amount of intended or probable loss was less than $200,000 which would yield a total offense level of 12 rather than 17.

counts of the indictment, defendant has admitted all of the allegations set forth in paragraphs 1 through 26.

In *United States v. Broce*, 488 U.S. 563, 563, 109 S.Ct. 757, 759, 102 L.Ed.2d 927, 936 (1989) the Supreme Court stated:

A guilty plea 'is more than a confession which admits that the accused did various acts' *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 242–23 L.Ed.2d 274 (1969). It is an 'admission that he committed the crime charged against him' *North Carolina v. Alford*, 400 U.S. 25, 32, 91 S.Ct. 160, 27 L.Ed.2d 162, 56 Ohio Ops.2d 85 (1970). By entering a plea of guilty, the accused is not simply stating that he did the discreet acts described in the indictment; he is admitting guilt of a substantive crime.

If defendant did not commit some of the acts charged in the indictment, he should not have pleaded guilty. He cannot now contest selected portions of the scheme to defraud to which he has entered a plea of guilty. Furthermore, defendant has not shown that a favorable ruling on his objections would have a bearing on any of the factors to be considered by the court in determining an appropriate sentence.

Defendant's objections numbers 1 and 2 are overruled.

### Objection Number 4

█ Defendant objects to the probation officer's determination that defendant commingled hundreds of thousands of investors' dollars with bank accounts belonging to Miura Petroleum or other corporations owned by defendant which were totally unrelated to the investment projects. (PSI, para. 13). Defendant admits that he commingled funds but he apparently disputes the amounts of investor's money he spent on such things as purchase of a racetrack and race cars. (PSI, para. 103).

The law of this circuit is quite clear regarding the types of evidence which the court may consider in connection with imposing sentence. In *United States v. Beaulieu*, 893 F.2d 1177, 1179 (10th Cir.1990) *cert. denied*,

497 U.S. 1038, 110 S.Ct. 3302, 111 L.Ed.2d 811 (1990) the court stated:

Prior to the enactment of the Sentencing Guidelines, the circuit courts had uniformly held that reliable hearsay evidence could be considered in the sentencing determination. *See e.g. U.S. v. Shepherd*, 739 F.2d 510, 515 (10th Cir.1984) (the sentencing judge may properly consider uncorroborated hearsay evidence that the defendant has had an opportunity to rebut or explain.) ... We find nothing in the Guidelines to suggest that a different rule now applies. Section A1.3 of the Guidelines provides:

a. When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor. In resolving any reasonable dispute concerning a factor important to a sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.

\*     \*     \*     \*     \*     \*

It is clear from these passages that the Guidelines were not intended to place a new restriction on the sources of the information available to the sentencing judge ... the Guidelines expressly allowed the use of any reliable information. When there is reason to question the reliability of the information made available to the judge, the Guidelines endorse the preexisting practice of allowing the district court to conduct an evidentiary hearing ... in arriving at the appropriate sentence within the Guideline standards, then, the judge may use any reliable source of information—just as he or she could before the adoption of the Guidelines.

█ The government has the burden of proving the amount of loss. *United States v. Smith*, 951 F.2d 1164 (10th Cir.1991). The quantum of proof required for factual determination is a preponderance of the evidence. *United States v. Easterling*, 921 F.2d 1073,

1077 (10th Cir.1990) *cert. denied,* —— U.S. ——, 111 S.Ct. 2066, 114 L.Ed.2d 470 (1991). A preponderance of the evidence simply means proof that something is more likely so than not so. As an officer of the court, the probation officer may be considered a reliable source. *United States v. Hershberger,* 962 F.2d 1548, 1555 (10th. Cir.1992).

The court finds the probation officer's statements to be reliable and that the government has met its burden of proof on this issue. The United States Attorney was not required to call the probation officer as a witness, although there was nothing which prevented defendant from doing so if he genuinely questioned the probation officer's findings. *United States v. Wise,* 990 F.2d 1545, 1549 (10th Cir.1992). Defendant did not testify at the hearing and the court is not persuaded by defendant's unsworn written statement that he only "converted approximately $12,000 to his personal use in order to buy race car parts." While the burden of proof on this issue was on the government, the Tenth Circuit has found no error when the district court, after the government met its burden of proof, looked to the defendant to present evidence which would directly and substantively contradict the government's evidence. *United States v. Levy,* 992 F.2d 1081, 1083 (10th Cir.1993).

Defendant's objection number 4 is overruled.

### Objection Number 5

Defendant objects to the probation officer's statement that in 1987, defendant requested and was provided an estimate for insurance coverage for property and personnel of Miura Petroleum totalling premiums of approximately $257,000. (PSI, para. 14). Defendant states "it should be noted that the defendant received funds from only four investors totalling approximately $40,000, not the face amount of the insurance policies." Defendant admits that he collected funds from the investors for liability insurance but failed to pay the premiums.

The court interprets the probation officer's statement to be that the total amount of premiums was approximately $270,000, not that defendant collected $270,000 from the investors and then converted the $270,000 to his own use.

Defendant's objection number 5 is overruled.

### Objection Regarding Acceptance of Responsibility Objection Number 7

Defendant objects to the probation officer's statement that in defendant's version of the offense, he tended to minimize his role in the offense and the amount of loss sustained by the investors. (PSI, para. 22). Defendant merely argues that the intended or probable loss was less than $200,000. (PSI, para. 118).

Based on the defendant's unsworn statement, the overall tenor of his objections to the presentence report, the evidence he sought to elicit at the hearing and in the post-hearing memoranda filed by his counsel, there can be no question that the defendant has sought, and continues to seek, to minimize his role in the offense and the loss to the investors. The probation officer's observation was right on the money.

Defendant's objection number 7 is overruled.

### Objection Regarding Physical Condition Objection Number 9

Defendant objects to the probation officer's statement regarding defendant's physical condition. (PSI, para. 56). Defendant states:

The surgery for sinus infection was unsuccessful as the letter to the Senior U.S. Probation Officer by the defendant indicates (see Exhibit C). A determination as to further surgery will be made at a later date. In the meantime, the professional prognosis is that the defendant will continue to encounter physical difficulties.

In response to the objection, the probation officer refers to a supplemental report from defendant's physician, Edward J. Gehriner, indicating that following surgery, defendant's

symptoms of diplopia [4] have diminished and will eventually subside. The court accepts the statements of the probation officer. There is no evidence in the record that defendant's physical condition has any bearing on any of the factors the court must consider in imposing sentence.

Defendant's objection number 9 is overruled.

### Objection Regarding Impact of the Plea Agreement Objection Number 10

Defendant objects to the probation officer's observations regarding the impact of the plea agreement's provision that the remaining counts of the indictment will be dismissed at the time sentence is imposed. (PSI, paras. 65–67). Defendant's objection states:

> The dismissal of the other Counts of the Indictment should not have an impact upon the potential sentence as all Counts would be subject to the Guidelines and are already included in the computation of loss for sentencing purposes. Counts 2, 5, 9, 15 and 22 are applicable but would not alter the Guideline range for supervised release. (Docket 34; PSI para. 128)

■ It is well established that the relevant conduct provisions of the guidelines contemplate that acts which were part of the scheme to defraud may be considered for sentencing purposes, whether or not the defendant was convicted of all of the acts. U.S.S.G. § 1B1.3. See also *United States v. Fine*, 975 F.2d 596, 600 (9th Cir.1992).

Defendant's objection number 10, if it is an objection, is overruled.

### Objection Regarding Departures Objection Number 12

Defendant objects to the probation officer's observation that U.S.S.G. § 2F1.1 has been amended and provides for an increase of 14 levels if the loss exceeds $5 million. U.S.S.G. § 2F1.1(b)(1)(O). (PSI, para. 81). Defendant contends that utilization of the

amendment would result in a retroactive application of the amendment not envisioned by the constitution and further would constitute "ex post facto application of law in contravention of Article I, Section 10(1) of the United States Constitution." (PSI, para. 135).

The probation officer's response is that he was simply calling the amendment to the court's attention as a factor which may warrant departure but that he is not recommending such a departure. The probation officer appropriately utilized the 1987 sentencing guidelines because application of section 2F1.1 of the present guidelines would disadvantage the defendant. *United States v. Underwood*, 938 F.2d 1086 (10th Cir.1991).

Since the court does not intend to utilize the amendment, defendant's objection number 12 is moot.

### Objections Regarding Victim Impact Objections Numbers 3, 6 and 8 Objection Number 3

■ Defendant objects to the probation officer's statements that defendant offered and sold interests in a project known as the Caravel Pipeline. (PSI, para. 12). Defendant contends that the pipeline was owned by others and that Miura Petroleum participated only as the operator in exchange for a 10% interest in the pipeline. (PSI, para. 95).

According to evidence introduced at the hearing, Caravel Pipeline (also called Caravel Energy of Kansas, Inc.) was acquired in late 1985 or early 1986 by the operator of an adjacent gathering system, American Fuel Transit. Then, in late 1986, Caravel Pipeline was sold to John Peterson. At that time, neither defendant nor Miura Petroleum had any interest in Caravel or American Fuel Transit.

After Peterson acquired Caravel, defendant or Miura Petroleum (or both) also acquired an interest in Caravel (apparently 10%). Defendant became the operator of the pipeline although soon thereafter, another operator, Quoque Oil and Gas,[5] became in-

---

4. Double vision.

5. The owners of Quogue were Lee Demler and Ernie Griff. Their status as investors of Miura

Petroleum is unclear but they were actively involved in Miura's operations. Ralph Holt, at some point, became a 10% owner, as well.

volved from an operational standpoint and, eventually, assumed ownership of Caravel. The evidence at the hearing was to the effect that as natural gas prices-increase, so too does the value of the owners' interest in Caravel. No dollar amounts were discussed, however.

Ralph Holt purchased a 1/7 interest in Caravel in January 1987. The purchase price was $100,000. Holt believes the check was made out to Miura Petroleum. Holt learned about Caravel from James Draper, who he believed was acting as an agent for Miura. He later received correspondence from defendant as operator and when additional funds were needed, defendant was "a party" to the request for the funds.

Holt testified that when Caravel was sold, he received "nothing directly" but he remains a 10% owner in Quoque. Quoque since has acquired additional leases and has drilled additional wells. Holt testified that he did not know how much, if any, of Quoque's present, but unstated value, can be attributed to Caravel.

Based upon the evidence adduced at the hearing, defendant's objection number 3 is overruled.

### Objections Numbers 6 and 8

Defendant objects to the probation officer's findings regarding the amounts of loss suffered by some 54 separately-identified investors. The investors, projects and amounts are set forth in paragraph 18 of the presentence investigation.

Defendant's objections are set forth in paragraphs 110–114 of the presentence investigation. The objections can be broken down into categories:

1. The figures used by the probation officer represent the amounts invested and do not take into account that some of the funds were used for legitimate purposes such as drilling costs, equipment purchases, etc.

2. The figures do not take into account any retained or residual value of the investments, tax advantages and unpaid debts allegedly owed to Miura by the investors.

3. The figures relating to certain projects (Caravel, Frederick, Ladd, Myers Farm and Skaer) are not relevant because defendant was not involved in the sale of the projects; he only acted as the operator.

4. The figures pertaining to the Caravel, Frederick, Ladd, Myers Farm, Skaer, Leach, Casey, Eagle Creek properties and rigs are not involved in any of the counts charged.

5. Miura has agreed to refund $2,000,000 to the investors as part of a settlement.

In the presentence report, the probation officer indicated that his loss figures had come from information provided by the government but he deferred to evidence to be offered at the hearing regarding amounts of loss. Therefore, while the court will not totally disregard the loss figures used by the probation officer, it will turn to a resume of the evidence brought out at the hearing.

The government's first witness was Ralph Holt, a major investor. Holt testified, in general, that pursuant to solicitations from defendant or defendant's agent, Draper, he made investments in various projects. He provided a summary of his and his children's investments (Gov't. Exhibit 1) showing investments and insurance payments totalling $1,218,921.53.

Holt, along with others, purchased what he understood to be a percentage working interest in the Leach field, only to learn later that Miura had no working interest to convey. He received some minimal returns on his "investment" but they never exceeded the additional funds he injected into the project to cover expenses.

Holt testified regarding other projects. The Wewoka investment did yield revenues in excess of expenses on some occasions. He and some of the other investors still retain an interest in the project, the value of which is unknown. Holt pointed out that the property is unsaleable because defendant also holds an interest but is uncooperative. He opined that under a frugal operator, the project "could have some net revenue value; however I believe it would be minimal and not equivalent to the proportionate investment that I have there."

Holt also testified regarding his investments in the Skaer, Oklahoma City, Birdie, Malan and Simms–Jackson projects. The general tenor of his testimony was that he may have received returns on his investments from some of the leases but as a collective group, in none of the projects did revenues exceed expenses. While he still owns an interest in some of the wells, the wells are not producing income and their only value might be the value of the surface equipment less costs of plugging.

Finally, Holt testified regarding his investments in two oil rigs (#'s 7 and 8). He lost approximately $9,000 on Rig # 8. The amount of loss on Rig # 7 is unclear. Holt testified that defendant represented the rig was worth $15 million but eventually the investors managed to sell the rig on contract for $325,000. The investors are still making payments to a bank on their obligation but the buyers defaulted after paying $140,000 of the purchase price.

The government called Kelly Schmidt, a petroleum engineer who had been hired in February 1988 by a Miura investor to evaluate the following properties: Eagle Creek, Myers Farm, Caravel, Skaer, Ladd, Casey, Frederick and Leach, all located in Kansas. Schmidt concluded that all except Caravel had no value and that the value of Caravel's leases was only marginal, i.e. that income and expenses would be about equal. He admitted that Caravel had some value as a gathering system (apart from its leases), but he could give no estimate of its value.

In 1988, Schmidt also evaluated the following leases in Oklahoma: the Oklahoma City group, Birdie # 2, Jewell # 1 and # 2, Malan and Simms–Jackson. Schmidt believed that the Oklahoma City group would be worth around $900,000 if investors put up another $400,00. Birdie # 2, a dry hole, Malan and Simms–Jackson had no economic value and should be plugged. Jewell # 1 was making about 20 barrels per day and he estimated its value at about $124,000.

Schmidt pointed out that the investors are liable for the costs of plugging. He referred to an evaluation done by someone else that the equipment value on eight of the Oklahoma wells totalled approximately $600,000.

No similar study was done for the properties located in Kansas but Schmidt opined that the value of the surface equipment as opposed to the plugging costs would be "almost a wash" because Kansas wells are shallow.

The government's final witness was Postal Inspector Robert Schick. Beginning in late 1988, Schick contacted 65 investors. Eventually he received approximately 40–45 responses. Based on the responses, as well as his review of canceled checks provided by investors, corporate records of Miura Petroleum and other entities and base agreements, he determined the approximate value of monies invested at $8 million. This figure did not include other costs associated with the projects.

Later, in October 1992, he wrote to all 65 investors and received written responses from 37. He asked for the total amount of money "invested with McAlpine and/or Miura less any payments you received from them such as oil and gas production payments, refund monies, or any monies received from bankruptcy proceedings." Based on the responses, he calculated a loss figure of $5.3 million.

The defendant called two witnesses: Jon Viets, who testified concerning the Caravel Pipeline (see Objection Number 3, *supra*) and John McAlpine, defendant's father. Mr. McAlpine worked as a consultant for his son beginning in October 1986. Later, he served as debtor in possession of Miura Petroleum from May 24, 1989 to May 7, 1992. Mr. McAlpine was a very credible witness.

Mr. McAlpine testified that it was impossible for him to tell exactly how much money the investors had invested in Miura. He did his own investigation (apparently some time in 1987) and determined that the investors had put in approximately $7 million but that he had no idea where most of the money had gone. He related that Miura's records were so bad that even though he tried, he could never determine how much money had been invested, or where it went, but he was of the opinion that his son had hidden money away.

Mr. McAlpine testified that it was determined in the bankruptcy proceedings that the investors owed Miura approximately $1.1

million. He also testified that equipment worth approximately $270,000 was removed from one lease (Brogden, in Oklahoma) at the direction of Ralph Holt. He opined that some of the Oklahoma wells could have operated profitably if the investors had contributed operating funds. He also opined that in 1987, the Casey field in Oklahoma had a value of $166,000 based on its production at that time.

Mr. McAlpine testified that his son had lied to him about several things. For example, his son had told him that Miura owned the Leach field when, in fact, it did not. At one point, his son told him he had received about $850,000 from the investors on the Leach project while, at the same time, bills on the project were not being paid. His son purchased a home and told his father it was mortgaged but Mr. McAlpine later learned his son had paid cash for the home. His son was into race cars but Mr. McAlpine did not know where he was getting money to buy the cars. His son formed 26 separate corporations, one of which was located in the Bahamas, but Mr. Alpine could not trace the money going into the corporations. His son was buying equipment for Miura projects and then selling the equipment without paying suppliers. He also was using Miura investor's funds for personal purchases.

For better or for worse,[6] the court must first resort to the sentencing guidelines in order to resolve defendant's objections.

U.S.S.G. § 1B1.3(a)(2)(i) (October 1987) provides that specific offense characteristics *shall* be determined on the basis of the following:

1. All acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction ...

2. Solely with respect to offenses of a character for which section 3D1.2(d) [counts which involve the same general type of offense, as in this case] would require grouping of multiple counts, all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction;

\* \* \* \* \* \*

4. The defendant's state of mind, intent, motive and purpose in committing the offense ...

The commentary to section 1B1.3 provides, in pertinent part:

*Background:* this section prescribes rules for determining the applicable guideline sentencing range.... Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range....

\* \* \* \* \* \*

---

**6.** While this court generally believes that the concept of judicial restraint applies to gratuitous, editorial comments by the court, an exception is in order in this case.

Recently, the court sentenced a defendant who, from 1985 through 1989, embezzled approximately $45,000 from a bank at which she was employed. The defendant had acted in concert with another bank employee so "collective accounting" authorized by U.S.S.G. § 1B1.3(a)(1)(B) allowed aggregation of the amounts of loss, even though the defendant embezzled only $45,000. This resulted in an 8 level increase to the base offense level of 4. A 2 level increase for more than minimal planning and another 2 level increase for being in a position of trust raised the adjusted offense level to 16. Defendant was credited with a 3 level decrease for acceptance of responsibility which resulted in a total offense level of 13 which, in turn, yielded a custody range of 12–18 months. Under the 1987 guidelines, the total offense level would have

been 12 which would have yielded a custody range of 10–16 months using criminal history category I.

In this case, defendant's criminal history is category III (unobjected to) and his offense level, utilizing a loss figure of over $5 million, is 17. Addition of 2 levels for more than minimal planning raises the figure to 19. If acceptance of responsibility is given (to put the two cases in parity to the maximum extent possible), the total offense level drops to 17 which translates to a custody guideline range of 30–37 months. If defendant's criminal history was category I, the custody range would be 24–30 months.

Although the court recognizes that some disparity in sentences is inevitable, even under the guidelines, the relatively minimal differences in guideline ranges between the two cases seems to reward the defendant who takes more (in this case, much more). The court cannot discern any reasonable rationale for this disparity.

Subsection (a)(2) provides for consideration of a broader range of conduct with respect to one class of offenses, primarily certain ... fraud ... offenses for which the guidelines depend substantially on quantity.... The distinction is made on the basis of section 3D1.2(d), which provides for grouping together (*i.e.*, treating as a single count) all counts charging offenses of a type covered by this subsection. However, the applicability of subsection (a)(2) does not depend upon whether multiple counts are alleged. Thus, in an embezzlement case, for example, embezzled funds that may not be specified in any count of conviction are nonetheless included in determining the offense level if they are part of the same course of conduct or part of the same scheme or plan as the count of conviction.

  *  *  *  *  *  *

Subsection (a)(4) requires consideration of the defendant's "state of mind, intent, motive or purpose in committing the offense." The defendant's state of mind is an element of the offense that may constitute a specific offense characteristic.... The guidelines also incorporate broader notions of intent or purpose that are not elements of the offense, *e.g.* whether the offense was committed for profit.... Accordingly, such factors must be considered in determining the applicable guideline range.

U.S.S.G. § 2F1.1 (October 1987) provides:

*Fraud and Deceit*

(a) Base Offense Level: 6

(b) Specific Offense Characteristics

(1) If the estimated, probable or intended loss exceeded $2,000, increase the offense level as follows:

| | Loss | Increase in Level |
|---|---|---|
| (A) | $2,000 or less | no increase |
| (B) | $2,001 – $5,000 | add 1 |
| (C) | $5,001 – $10,000 | add 2 |
| (D) | $10,001 – $20,000 | add 3 |
| (E) | $20,001 – $50,000 | add 4 |
| (F) | $50,001 – $100,000 | add 5 |
| (G) | $100,001 – $200,000 | add 6 |
| (H) | $200,001 – $500,000 | add 7 |
| (I) | $500,001 – $1,000,000 | add 8 |
| (J) | $1,000,001 – $2,000,000 | add 9 |
| (K) | $2,000,001 – $5,000,000 | add 10 |
| (L) | over $5,000,000 | add 11 |

(2) If the offense involved (A) more than minimal planning; (B) a scheme to defraud more than one victim; (C) a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious or political organization, or a government agency; or (D) violation of any judicial or administrative order, injunction, decree or process; increase by 2 levels, but if the result is less than level 10, increase to level 10.

U.S.S.G. § 2F1.1 commentary, application notes 6 and 8 provide:

6. Some fraudulent schemes may result in multiple-count indictments, depending on the technical elements of the offense. The cumulative loss produced by a common scheme or course of conduct should be used in determining the offense level, regardless of the number of counts of conviction. *See* Chapter Three part D (multiple counts).

8. The amount of loss need not be precise, the court is not expected to identify each victim and the loss he suffered to arrive at an exact figure. The court need make only a reasonable estimate of the range of loss, given the available information. The estimate may be based on the approximate number of victims and an estimate of the average loss to each victim or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations....

U.S.S.G. § 2F1.1 must be read in conjunction with section 2B1.1. *United States v. Johnson*, 971 F.2d 562, 576 (10th Cir.1992). The application notes to that section provide, in pertinent part:

2. "Loss" means the value of the property taken....

3. The loss need not be determined with precision, and may be inferred from any reasonably reliable information, including the scope of the operation.

  *  *  *  *  *  *

The guidelines provide enhancement for more than minimal planning, which includes most offense behavior involving affirmative acts on multiple occasions. Plan-

ning and repeated acts are indicative of an intention and potential to do considerable harm. Also, planning is often related to increased difficulties of detection and proof.

The Tenth Circuit has analyzed the aforesaid sections and comments in several decisions. In *United States v. Smith,* 951 F.2d 1164, 1166, 1167 (10th Cir.1991) the Court observed:

> The Guidelines increase a defendant's base offense level sentence for either actual or intended loss, whichever is greater. (Citation omitted). Where the fraud results in actual loss within the definition provided by the commentary to Guidelines § 2B1.1, that value will be considered for purposes of enhancement under section 2F1.1. Where there is no such loss, or where actual loss is less than the loss the defendant intended to inflict, intended or probable loss may be considered. Application Note 7, Guidelines § 2F1.1; (citations omitted).

*    *    *    *    *    *

This net concept of actual loss comports with common law valuation of fraud. Under the common law, if a defendant deceitfully persuaded a victim to give up something of value, the calculation of loss takes into account any value given to the victim by the defrauder. *See* Dan B. Dobbs, *Remedies* § 9.2 at 594–98 (1973) (various damage formulae for civil fraud based on net rather than gross value); Guidelines § 2F1.1, Application note 7(a) (No 1, 1991).

The opinion goes on to indicate that use of intended loss is appropriate in situations where the defrauding party obtains something of value, intending to give nothing in return.

■ Based on *Smith,* the court believes that it should attempt to determine an actual, rather than intended, loss in this case. This is because defendant's scheme persuaded the victims to give up something of value and defendant did give at least some of the victims something of value in return.

■ However, while actual loss must be measured by the net value, not gross value,

of what was taken, it is also clear that "loss" is not simply intended to be a measure of the net monetary damage to the victim. Its purpose is to gauge the severity of a particular offense. *United States v. Lara,* 956 F.2d 994, 998 (10th Cir.1992).

■ It is one thing to cite general principles regarding determination of actual loss; it is another matter to determine it. In doing so, the court must rely to some extent on estimates. The Tenth Circuit has held that it is acceptable to estimate the amount of loss from a fraud scheme in order to determine restitution obligations. *United States v. Brewer and Honel,* 983 F.2d 181, 183 (10th Cir.1993), *cert. denied,* — U.S. ——, 113 S.Ct. 2348, 124 L.Ed.2d 257 (1993). Moreover, the court has held in the context of calculating drug quantities, estimates are acceptable as long as the evidence supporting the estimate has a minimum indicia of reliability. *United States v. McIntyre,* 997 F.2d 687 (1993), citing *United States v. Easterling, supra,* at p. 1077. There is no logical reason why these concepts should not apply in determining the amount of actual loss in a fraud case.

Finally, in *United States v. Levine,* 970 F.2d 681, 690 (10th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 289, 121 L.Ed.2d 214 (1992), the court approved the district court's determination that actual loss fell between a range of two figures. Therefore, there is no reason why the court cannot estimate an actual loss greater than one figure.

■ The evidence demonstrated that the investors put at least $7 million into the various Miura projects. This is the gross figure and therefore it cannot be used to fix the loss. However, the court finds reliable the postal inspector's loss figure of approximately $5.3 million which represents, *for 37 of the investors,* the moneys they invested less payments received. The figures are based upon letters which are hearsay, but hearsay is admissible. The letters are reliable because they are responses to official investigative inquiries and because nothing was adduced during the postal inspector's testimony which would cast doubt on their reliability. The postal inspector believed that the figures were reliable based not only

on the letters themselves but also the records he had seen during his investigation. The basis for his belief was not impeached during cross examination.

The court also finds reliable the testimony of petroleum engineer Schmidt who found that most of the properties he evaluated had either no value or minimal value. While it is true that he valued the Oklahoma City property at $900,000, that value was based upon an investor injection of $400,000. Therefore, the value of the property as he saw it in 1988 was $500,000. Schmidt also assigned a value of $124,000 to another Oklahoma property (Jewell # 1) and the court accepts this value as reliable.

Schmidt observed equipment on some of the Oklahoma properties but he did not value it. While he did refer to a "well equipment appraisal" done by someone else, he did not express any opinion whether the appraisal was reliable and it does not appear that he relied upon it. For these reasons, the court will disregard the equipment appraisal.

Finally, the court accepts the testimony of John McAlpine regarding the Casey field's value of $124,000 in 1987 and that equipment valued at $270,000 was removed from some of the Oklahoma wells.

The following calculation can be made using these "hard" figures:

| | |
|---|---|
| Losses of 37 investors | $5,300,000 |
| —Oklahoma City property | 500,000 |
| —Jewell # 1 | 124,000 |
| —Casey | 124,000 |
| —Equipment removed | 270,000 |
| | $4,282,000 |

The court does not accept defendant's argument for additional deductions. For example, it may be true that the investors failed to contribute $1.1 million to Miura for expenses. It does not follow, however, that this amount should be deducted from losses. Based on the evidence, it is certain that defendant would have diverted or pocketed a substantial portion of the money. One can hardly reward defendant when defrauded investors refuse to throw bad money after bad.

■ The court also is unpersuaded by defendant's argument that another $2,000,-000 should be deducted from losses as "tax savings." Defendant has cited no authority for such a deduction and the concept would seem contrary to the rule that a "theft loss," for purposes of guideline calculations, should not be reduced by the value of items ultimately recovered by the victim. *United States v. Westmoreland,* 911 F.2d 398 (10th Cir.1990). The tax consequences of oil investments, particularly bad investments, are so complicated that a determination of tax benefits, if any, enjoyed by the investors would be pure speculation.

Finally, the court cannot accept defendant's argument that he should be credited for $2 million Miura has agreed to repay the investors as part of some "settlement." Miura is bankrupt. There is no evidence to suggest that Miura, now or ever, will repay a dime to any of the investors.

The guidelines and cases make it clear that the court shall consider in determining the guideline range *not only* acts for which defendant has not been convicted, but is otherwise accountable, *but also defendant's state of mind, intent, motive and purpose.* In this regard, the court is drawn to the testimony of John McAlpine. His testimony demonstrates beyond peradventure that from the beginning of the scheme and throughout its existence, defendant's principal, if not only, purpose was to defraud others. The court is wholly unpersuaded by defendant's unsworn statement to the effect that the scheme was mostly a legitimate, speculative oil and gas venture which went south because of matters largely out of his control.

The 37 investors who responded to the postal inspector do not represent all of the investors. While the actual losses sustained by the other investors cannot be precisely determined, there is no reason to ignore them or to assume that they did not suffer losses, too. On the contrary, in view of the scope of the scheme and the fact it is shot through and through with fraud, the only reasonable conclusion is that the other investors likewise suffered losses. The court has no trouble concluding that when the entire scheme is considered, as it must be, the actual loss exceeds $5 million.

Defendant's objections numbers 6 and 8 are overruled.

### Objection Regarding Fines
### Objection Number 11

Defendant objects to the probation officer's finding that for the counts of conviction, the fine range is from $5–50,000. (PSI, para. 76). Defendant states that based upon an offense level of 12, the range is from $3–30,000. He also argues that he is unable to pay a fine due to his financial and physical conditions and that imposition of a fine would "unduly burden his spouse." (PSI, para. 132).

The probation officer has not recommended a fine and the court concurs with the recommendation.

Defendant's objection number 11 is overruled.

### Acceptance of Responsibility

■ The plea agreement provides that the government will recommend that defendant will receive a 2 level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1 and that it will also recommend a sentence at the low end of the guideline range. The probation officer has applied the former recommendation for the calculations contained in the presentence report. However, defendant was unequivocally informed by the court at the time of his plea that the court did not have to follow the plea agreement. Rule 11(e)(2), Fed.R.Crim.P. The petition to enter a plea of guilty (Doc. 28, para. 16) acknowledges defendant's understanding that the court is not bound by the plea agreement and defendant made the same acknowledgment in open court.

U.S.S.G. § 3E1.1 provides, in pertinent part:

### Acceptance of Responsibility

(a) If the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct, reduce the offense level by 2 levels.

\* \* \* \* \* \*

(c) A defendant who enters a guilty plea is not entitled to a sentencing reduction under this section as a matter of right.

The accompanying commentary provides:
*Application Notes:*

1. In determining whether a defendant qualifies for this provision, appropriate considerations include, but are not limited to, the following:

   (a) voluntary termination or withdrawal from criminal conduct or associations;

   (b) voluntary payment of restitution prior to adjudication of guilt;

   (c) voluntary and truthful admission to authorities of involvement in the offense and related conduct;

   (d) voluntary surrender to authorities promptly after commission of the offense;

   (e) voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense;

   (f) voluntary resignation from the office or position held during the commission of the offense; and

   (g) the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.

   \* \* \* \* \* \*

3. A guilty plea may provide some evidence of the defendant's acceptance of responsibility. However, it does not, by itself, entitle a defendant to a reduced sentence under the section.

5. The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review and should not be disturbed unless it is without foundation.

■ Defendant, not the government, bears the burden on this issue. *United States v. Wach*, 907 F.2d 1038, 1040 (10th Cir.1990). In determining whether to apply the reduction, the court may consider that although defendant has admitted the commission of the crimes, he did not accept fully that his actions were morally and legally improper and failed to disclose to authorities

the extent of his illegal activities. *United States v. Whitehead,* 912 F.2d 448, 451 (10th Cir.1990). The court is not bound by any agreement between the government and defendant regarding acceptance of responsibility. *United States v. Hernandez,* 967 F.2d 456, 459 (10th Cir.1992).

Defendant has elected to meet his burden by submitting an unsworn statement. While the court doubts that an oath has any meaning to defendant, the lack of an oath, in this judicial proceeding, has meaning to the court. Equally meaningful is the fact that defendant did not testify at the sentencing hearing. Since he had no Fifth Amendment privilege to exercise, the only reasonable conclusion is that defendant did not want to expose himself to cross-examination.

Defendant begins his statement by contending that "The fraud primarily involved the inefficient operation of the fields and shoddy accounting techniques used by the defendant." This is a transparently disingenuous excuse which, as the probation officer noted, is nothing more than an attempt by defendant to minimize his involvement. It is totally unsatisfactory as an admission that defendant's acts were morally and legally *improper.*

Defendant does admit that he commingled funds intended to purchase insurance with operational accounts but he attempts to justify this by claiming that the funds were insufficient to purchase the insurance. If the funds were insufficient, they should have been returned to the investors. The investors had a right to expect that funds requested for a specific purpose would be used for that purpose.

Defendant admits that he misrepresented the costs of extracting reserves "insofar as the counts to which he has pleaded," whatever that qualification is supposed to mean. He then goes on to "allege" that many of the properties are producing, some profitably, and retain value. He states that he "intends to seek expert testimony regarding the value of the property and equipment involved, and will make such information available to the court when received."

Defendant essentially failed to produce this evidence. His proffers of residual value were based on his "belief." A defendant convicted of fraud cannot reasonably expect a court to rely on his unsworn and untested expressions of "belief."

Finally, defendant reminds the court that the investors were "sophisticated" and that the investments were "risky." This may, or may not, be true but it is no justification for defendant's fraudulent conduct. An investor, sophisticated or not, has the right to expect that he will be dealt with honestly. The risks involved with oil and gas ventures do not include the risk that the investor will be defrauded.

There is much missing in the defendant's statement. Totally absent is any expression of regret or remorse. There is no explanation regarding what *really* was done with the investor's money, even though defendant is the only person who is in a position to know. The overall thrust of defendant's statement is that the whole thing was just a bad business deal, touched here and there with minimal avarice and personal gain on his part.

To the extent that the guidelines bear on this issue, the court notes that defendant has done none of the things which the guidelines recognize as indicia of acceptance of responsibility.

For all these reasons, the court will not credit defendant with acceptance of responsibility. This raises the total offense level to 19. Nor will the court accept the government's recommendation that defendant be sentenced at the low end of the guideline range. Defendant does not deserve such leniency. The court believes that the interests of justice demand that defendant be imprisoned for the greatest allowable period, if for no other reason than to isolate him from society. This court is of the firm belief that defendant is an unrepentant criminal who will continue his criminal lifestyle upon release from custody.

### Restitution

■ Restitution is governed by 18 U.S.C. §§ 3663–64 (Victim and Witness Protection Act [VWPA]). A restitution award under

the VWPA is authorized only for losses caused by conduct underlying the offense of conviction. *United States v. Brewer and Honel, supra* at pp. 183–84, citing *Hughey v. United States,* 495 U.S. 411, 420, 110 S.Ct. 1979, 1984, 109 L.Ed.2d 408 (1990). The Tenth Circuit has interpreted the phrase "offense of conviction" to be the "counts of conviction." *United States v. Cook,* 952 F.2d 1262, 1263–65 (1991).[7]

The following chart collates the information reflected in the counts of conviction and the information on actual loss determined by the postal inspector and probation officer. The indicated loss figures will constitute restitution figures for purposes of the sentence.

| Count | Victim Identified | Loss (rounded) |
|---|---|---|
| 2 (general mailing) | Ralph Holt, Jr. | see below |
| 4 (general mailing) | Ernest Greef Humphrey Simson (insurance payments) | |
| 6 (Birdie # 2) | Nils Peterson Kirsten Peterson Gretchen Peterson | 75,000 |
| 9 (Oklahoma City Production) | David Benedict | 50,000 |
| | David Lawrence | 100,000 |
| | John Peterson | 100,000 |
| | Douglas Siddoway | |
| | Nils Peterson | |
| | James Quantz | 75,000 |
| | Humphrey Simson | |
| | Ralph Holt, Jr. | 208,939 |
| | Joseph Torrence | |
| | Groton Partners | 50,000 |
| | Thomas Kuhns | 40,000 |
| | RHSO Lawrence Corp. | 68,393 |
| | W.E. Love, Jr. | |

7. The presentence report suggests that restitution for the entire amount of loss, i.e., the losses from *all* counts in the indictment, may be appropriate. This does not square with current Tenth Circuit law which holds that in light of *Hughey v. United States,* restitution can be based solely on counts of conviction. See *United States v. Wainwright,* 938 F.2d 1096 (10th Cir.1991). See also *United States v. Marsh,* 932 F.2d 710 (8th Cir.1991) and *United States v. Stone,* 948 F.2d 700 (11th Cir. 1991). The sole exception currently recognized by the Tenth Circuit is in a conspiracy case, where all conduct may be considered for purposes of restitution. *United States v. Brewer and Honel, supra.*

18 U.S.C. § 3663 was amended effective November 29, 1990, (P.L. 101–647) to provide that for purposes of restitution, a victim of an offense that involves as an element a scheme means any person directly harmed by the defendant's criminal conduct in the course of the scheme. 18 U.S.C. § 3663(a)(2). This amendment supports the probation officer's position.

18 U.S.C. § 3663(a)(3) was amended at the same time and this court has held with respect to § 3663(a)(3) that the statute in effect at time of sentencing controls. *United States v. Winkler,* 817 F.Supp. 1530, 1536 (1993). However, *Winkler* may not be directly applicable to this case, which involves the potential application of § 3663(a)(2), because *Winkler* dealt only with the effect of a plea agreement to make restitution. The plea agreement in this case does not so provide. See, also *United States v. Arnold,* 947 F.2d 1236, 1238 (5th Cir.1991) where the court "pretermitted" (did not decide) the question whether application of § 3663(a)(2) to conduct occurring before the amendment would violate the *ex post facto* clause. Finally, in *United States v. Jewett,* 978 F.2d 248, 253 (1992), the Sixth Circuit held that retroactive application of § 3663(a)(2) would be "constitutionally prohibited."

The parties have not briefed the effect, if any, of § 3663(a)(2) on this case and the court is loathe to postpone final sentencing while the parties do so. It would seem the better course to leave the issue for decision by the Tenth Circuit should this case be appealed or, if not, in some other case.

| Count | Victim Identified | Loss (rounded) |
|---|---|---|
| | Thomas Neff | |
| | R & R Investment | 50,000 |
| | John Scott, Jr. | |
| | Jarvis Slade | 50,000 |
| | WAD Association | |
| | Jeremy Wiesen | 100,000 |
| 15 (Simms–Jackson) | Ernest Greef | |
| | Sallie James | |
| | D.B. Lawrence & Co. | |
| | Nils Peterson | 25,000 |
| | James Quantz | 25,000 |
| | Humphrey Simson | |
| | Ralph Holt, Jr. | 25,156 |
| | Richard Flicker | 25,000 |
| | Paul Kelly | |
| | John McWilliams | |
| 22 (Jewel # 1 and # 2) | | |
| 23 (Brogden) | Ernest Greef | |
| | William Rogers | |
| | Humphrey Simson | |
| | Ralph Holt, Jr. | 72,891 |
| | J. Holt | 24,297 |
| | M. Holt | 24,297 |
| | R. Holt III | 24,297 |
| | C.A. Dillon III | 18,036 |
| | R. Leigh Duemler | |
| | Charles Flather | 100,000 |
| | Groton Partners | 72,145 |
| | Elizabeth Haven | |
| | Thomas Neff | |
| | Thomas Perakos | |

---

The aforesaid figures represent the court's best efforts to determine appropriate restitution based upon the information provided. The court has not overlooked the testimony of defendant's father and witness Schmidt regarding the residual values of the Oklahoma City properties but finds it insufficient in specificity to justify credit toward restitution. While the court has no doubt that some or all of the other identified investors suffered losses and may be entitled to restitution, the court was not presented with evidence upon which to base an award.

■ Defendant makes two arguments with respect to restitution. His first argument is that there are "judgments" [8] against him and Miura which will serve to satisfy the victims. This argument is without merit. There is no evidence that either Miura or defendant, now or ever, will satisfy any such judgments. Indeed, the evidence is entirely to the contrary.

■ Defendant's second argument is that restitution will result in hardship to his "spouse and family." This is one of the factors which the court may consider in determining the propriety of restitution. 18 U.S.C. § 3664(a). However, § 3664(d) makes it clear that *defendant* has the burden of proof on this issue. The court finds that

8. The record does not reflect the identity of the judgment creditors or the amounts of the judgments.

defendant has not met this burden. The Tenth Circuit has held that in certain circumstances, the sentencing court may order even an indigent defendant to pay restitution. *United States v. Williams,* 996 F.2d 231 (1993). In this case, there is a best inconclusive evidence regarding defendant's indigent status. The presentence report shows that both defendant and his wife have considerable unencumbered assets. While defendant's dependents undoubtedly have certain financial needs, there is no showing that these needs may not be met by the dependent's earning ability. In addition, there is no showing that defendant will not have sufficient earning ability once released from confinement to pay restitution. Finally, there is the unanswered question regarding unaccounted-for investment proceeds. While defendant *claims* he is indigent, he has failed to produce verifiable information concerning what he did with the investment proceeds and he has not responded to the evidence that he may have assets hidden in overseas accounts. In this latter regard, the court finds the testimony of defendant's father both probative and logical, when viewed in the context of the large amounts of unaccounted for investment sums.

Accordingly, the court orders that defendant make restitution in the amounts specified above within *3* years from the date of his release from confinement and as a condition of supervised release as authorized by 18 U.S.C. §§ 3663(F)(2)(B) and (g).

*Final Guideline Calculations*

The final guideline calculations are as follows:

| | |
|---|---|
| Base Offense Level | 6 |
| Loss Increase | 11 |
| More than Minimal Planning | 2 |
| TOTAL | 19 |

Using a criminal history category of III, the 1987 Sentencing Table yields an imprisonment range of 37 to 46 months.

*Imposition of Sentence*

The court determines that the presentence report (as corrected or modified by the court) and the previously stated findings are accurate and orders those findings to be incorporated in the following sentence:

Pursuant to the Sentencing Reform Act of 1984 (as amended by the Sentencing Act of 1987), it is the judgement of the Court that the defendant, Johnnie Louis McAlpine, is committed to the custody of the Bureau of Prisons for imprisonment for a term of forty-six (46) months, on Counts 2, 4, 5, 6, 9, 15, 22, and 23. The confinement sentences are to run concurrently.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three (3) years, each count, said terms to run concurrently. Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the probation office in the district to which the defendant is released.

While on supervised release, the defendant shall not commit another federal, state, or local crime, shall comply with the standard conditions that have been adopted by this court, and the following special conditions:

1. The defendant is prohibited from possessing or purchasing a firearm or other dangerous weapon.

2. After his release from incarceration, the defendant shall adhere to an installment schedule as directed by the U.S. Probation Office, for payment of any restitution still owed.

3. The defendant is prohibited from incurring new credit charges or opening new lines of credit without the approval of the United States Probation Officer, unless the defendant is in compliance with a payment schedule for restitution.

4. The defendant is required to provide the Probation Officer access to any requested financial information and shall execute all financial releases of information forms necessary to be used for the purpose of obtaining financial information.

5. The defendant is prohibited from reinvolving himself in the oil and gas business unless otherwise allowed by the court, at the request of the United States Probation Office.

With respect to restitution, the court has made its ruling. In consideration of the amount of loss sustained, the financial resources and needs of the defendant, and the earning ability of the defendant, and the defendant's dependents, the defendant should be ordered to pay restitution in the total amount of $1,403,451. All payments shall be dispersed equally to the victims, as stated in the order, among the identified victims. Payments shall be made to the Clerk of the U.S. District Court, Wichita, Kansas.

It is further ordered that the defendant pay to the United States, a special assessment of $400, payable immediately.

Voluntary surrender is denied. The defendant is ordered to custody.

The defendant and prosecutor are advised that the sentence imposed may be appealed pursuant to 18 U.S.C. § 3742 provisions.

IT IS SO ORDERED.